John P. ALLDAY, Appellant,

v.

Jesse BROWN, Secretary of Veterans Affairs, Appellee.

No. 93–644.

United States Court of Veterans Appeals.

April 14, 1995.

David A. Stein, for appellant, Samuel Ol-chyk, Washington, DC, was on the pleadings.

Mary Lou Keener, Gen. Counsel, Norman G. Cooper, Asst. Gen. Counsel, Thomas A. McLaughlin, Deputy Asst. Gen. Counsel, and Vito A. Clementi, Washington, DC, were on the brief, for the appellee.

Before KRAMER, IVERS, and STEINBERG, Judges.

STEINBERG, Judge:

The appellant, Korean conflict veteran John P. Allday, appeals two separate Board of Veterans' Appeals (BVA or Board) decisions issued on May 24, 1993. One denied entitlement to payment or reimbursement for the cost of unauthorized travel to Department of Veterans Affairs (VA) health-care facilities between November 6, 1990, and March 27, 1991. The other (1) denied the

reopening of his claim for service connection for heart disease; (2) denied service connection for residuals of a cerebral vascular accident (CVA); (3) denied service connection for residuals of lupus anticoagulant (lupus); and (4) granted a rating no higher than 40% for a subtotal gastrectomy for a duodenal ulcer with psychophysiological gastrointestinal reaction and anxiety [hereinafter ulcer and anxiety], previously evaluated as 20% disabling. Record (R.) at 6–12, 14–25. Both parties have filed briefs and the appellant has pending a motion for leave to file a second supplemental record on appeal (ROA) out of time. For the reasons that follow, the Court will in part affirm the BVA decision as to the disability-compensation claims and in part vacate the decision and remand a matter to the Board for further development and readjudication; as to the travel-reimbursement claim, the Court will vacate the BVA decision and remand the matter to the Board. The Court will also deny the appellant's motion to file a second supplemental ROA.

## I. Statement of Facts for Service–Connection Claims

The veteran served on active duty with the U.S. Army from October 1951 to September 1953 and from September 1955 to June 1957. R. at 30–31. An October 1951 induction medical examination report showed no remarkable findings or problems. R. at 34–35. October 1955 and December 1955 reenlistment examination reports were also unremarkable and stated: "No significant medical history." R. at 86–87, 88–89. (The facts applicable to the travel-reimbursement issue are set forth in part III.A., below.)

A May 1956 service medical record (SMR) noted that the veteran had complained of sharp stomach pain for the prior four days, and that medication had been prescribed. R. at 97. An SMR entry in July 1956 reported that the veteran had complained of mid-abdominal pain; the impression was "poss[ible] Duod[enal] ulcer", and medication was prescribed. R. at 100. A July 1956 SMR x-ray report stated: "There is niche like spoty [sic] contrast depot in prepyloric region by spot picture. Aspect of prepyloric gastric ulcer. Little fundus gastritis and duodenitis can be seen." R. at 104. A subsequent in-service x-

ray report (without a legible date) stated, "much improved gastritis" but the "duodenitis [is] unchanged". R. at 106.

An SMR prepared in May 1957 by a medical corpsman indicated that the veteran was admitted to the hospital for six days. The diagnoses were: 1. "Sinus arrhythmia", 2. "Anxiety reaction", and 3. "Ulcer, duodenum, n.e.c. [meaning of acronym not certain], without obstruction." R. at 80–81, 117, 137. That same month, a service clinical report stated that the veteran had "developed palpitations" and that the diagnosis was "sinus arrhythmia, cause undetermined". R. at 127. The hospital records disclosed that nitroglycerin was prescribed and that he had "pain in chest". R. at 128, 131. A June 1957 discharge examination report revealed neither abnormalities nor problems. R. at 133–34.

In July 1957, the veteran filed with VA a claim for compensation for, inter alia, an "ulcerated stomach" and "heart trouble". R. at 139–42. A September 1957 VA examination report noted his complaints of stomach trouble, nervousness, dizziness, and pain in his right knee. R. at 144–45. The report found "no murmurs[,] thrills[,] or ectopics" and "no rhythm irregularities" (R. at 145) (thrill is defined as "an abnormal fine tremor or vibration in the respiratory or circulatory systems felt on palpation"; ectopic is defined as "occurring in an abnormal position", WEBSTER'S MEDICAL DESK DICTIONARY 716, 200 (1986) [hereinafter WEBSTER'S]) and stated that the diagnosis was "anxiety reaction", and that "[p]eptic ulcer [was] not found" (R. at 163). The report of a VA special neuropsychiatric (NP) examination, conducted the same day, revealed that the veteran had complained of experiencing a "choking sensation and pain around his heart" and that the veteran's commanding officer had told him that he had had a heart attack. R. at 148–49. The veteran further reported that he had developed an ulcerated stomach in June 1956; the diagnosis was "anxiety reaction". R. at 148–49. A September 1957 x-ray of the veteran's chest revealed a normal heart and lungs "except for a chronic pleural reaction tenting the right leaf of the diaphragm near the costophrenic angle." R. at 151. A November 1957 VA examination report noted: "Veteran does not complain of any trouble

concerning his heart except that it beats too fast and he has headaches. His entire clinical heart examination is negative," and "there is no significant arteriosclerosis." R. at 146–47. The diagnosis was, inter alia, "no cardiac pathology found" and "no peptic ulcer found". R. at 165.

In December 1957, a VA regional office (RO) awarded service connection with a 0% rating for a "duodenal ulcer with anxiety reaction, mild." R. at 167. The decision stated: "The service records also show treatment from 5–18–57 to 5–24–57 for an anxiety reaction and a duodenal ulcer, both conditions held as being incurred in line of duty. Recent Out Patient examination does not confirm the presence of an ulcer but a mildly disabling anxiety reaction was found." *Ibid.*

From February 11 to March 7, 1958, the veteran was hospitalized at a VA medical center (MC) in Mississippi for what he reported as "epigastric pain which radiated up to his chest." R. at 170–71. He reported that his "nerves were pretty shaky", that it had been "going on for several years", and that he had been "sent home from Korea and said his heart was fluttering". R. at 170. A physical examination report showed: "Blood pressure 119/72. Rhythm was regular. There was a soft murmur heard at the mitral area on exercise, increased to grade II systolic murmur. Otherwise no cardiac abnormalities. There was moderate tenderness in the epigastrium." *Ibid.* The diagnosis was: "1. Psychophysiologic [gastrointestinal] reaction manifested by epigastric pain[,] nausea [and] epigastric tenderness" and "2. Anxiety reaction, chronic, moderate". R. at 171. A March 1958 RO decision assigned the veteran a 10% disability rating for "anxiety reaction, chr[onic], mod[erate], manifested by psychophysiologic [gastrointestinal] reaction (formerly duodenal ulcer with anxiety reaction)", effective February 1958. R. at 173. A March 1958 VA letter sent to the veteran stated, inter alia: "This award has been made to you for your nervous condition." Supplemental (Suppl.) R. at 22.

VA treatment and progress records for September 1959 and January 1961 reported that the veteran had complained of stomach pains; he was reported as "tense [and] ner-

vous" in January 1961. R. at 176. A February 1961 RO decision confirmed the March 1958 RO decision. R. at 179.

According to an October 15, 1964, VA hospital record, the veteran was hospitalized from September 22, 1964, to October 15, 1964, complaining of abdominal pains, and was found to be "a highly nervous and anxious individual". R. at 183. Tenderness was noted in the epigastric area. Lab studies and blood count were normal. The diagnosis was, inter alia, "[o]bserved for duodenal ulcer; no definite ulcer demonstrated"; "[p]sychophysiologic gastrointestinal tract reaction"; and "[c]hronic anxiety reaction". *Ibid.*

A May 1980 letter from the veteran's representative stated that the veteran wanted "to amend his original claim to include service connection for his stomach ailment". R. at 199. Records received from the VAMC in Forth Worth, Texas, reported that the veteran had complained of peptic ulcer disease in June 1980 (R. at 222–26); noted a history of "some chest pain" in 1956 and subsequently, and reported that his chest was clear and his heart had "no murmur, rub or gallop" (R. at 223); and showed an impression of "[h]istory of possible intractable peptic ulcer disease", "[o]steoarthritis", and "[h]istory of chest pain which is nonexertional, of uncertain nature" (R. at 224). A few days later, the impression was "duodenal ulcer" and the plan was to admit him to surgery on July 15, 1980. R. at 225–26. Chest x-rays showed "no abnormality of the heart". R. at 227.

A July 1980 report from All Saints Episcopal Hospital indicated that the veteran had been admitted for surgery there on July 15, 1980, with a "chronic duodenal ulcer disease" as the preoperative and postoperative diagnosis, and had been discharged on July 24, 1980. R. at 204, 206, 207, 211, 237. He complained of "[e]pigastric distress, nausea and vomiting". R. at 205. "History" reported was: "Except for stomach problems, [he] has always been healthy ... [and] has always been nervous. He takes Valium for this.... He has had some episodes of chest pain which is [sic] probably related to his hernia." *Ibid.* With respect to his heart, the report noted: "Not enlarged. Regular rhythm, no murmurs." R. at 206. The surgery, "Vagotomy with hemigastrectomy and gastrojejunostomy" (R. at 204), was apparently performed in this hospital on an emergency basis because of his doctor's "absence". R. at 219. (A vagotomy is defined as the "surgical division of the vagus nerve" (vagus nerve is "either of the tenth pair of cranial nerves"); hemigastrectomy is "surgical removal of one half of the stomach"; gastrojejunostomy is "the surgical formation of a passage between the stomach and jejunum" (jejunum is "the section of the small intestine that comprises the first two fifths beyond the duodenum"), WEBSTER'S at 748, 287, 260, 359.)

The veteran then apparently applied for, inter alia, service connection for his heart condition. *See* R. at 233–34. In August 1980, he testified under oath that he had received nitroglycerin for his heart condition in the VA hospital in 1957. R. at 235. At that time, he was told the following: "They just said we had a fluttering of the heart, it was irregular, and for some reason the blood pressure dropped wa[y] below normal.... They were taking my blood pressure[,] I believe[,] every two hours.... [T]he doctors ... were concerned". R. at 244. He testified that in 1957, after he was discharged, he had been treated for his heart in Mississippi, but that since then he had not been treated for it, although he had requested VA treatment, and that he had used nitroglycerin for four or five weeks. R. at 244–45. He further stated that in the prior five years he had not received heart medication (R. at 235); that he experienced "weakness at times and the heart seems to flutter, then the dizziness occurs" (R. at 236); that he had never been evaluated by a cardiologist although electrocardiograms (EKGs) had been performed in 1957 and 1980 *(ibid.);* and that he did not currently take nitroglycerin and had not done so "in quite a while" (R. at 237). His representative requested that the veteran's heart condition be examined to determine its nature and severity. R. at 235.

In September 1980, a VA examination was conducted, for, inter alia, evaluation of possible heart disease and for a determination as to whether the veteran had manifestations of heart disease in 1956 or 1957 and if so, whether they were directly associated with any heart disease he may have then current-

ly had. R. at 255, 268–69. The diagnosis was, inter alia: "Chest pain of non specific type.... [EKG] and subsequent stress test have been ordered" R. at 256. A September 1980 chest x-ray report stated that there was no change since the May 1980 x-ray and concluded that there was "[n]o evidence of active chest disease". R. at 261. VA medical notes from October 1980 stated that the EKG "again shows poor progression of R waves in precordial leads as previously described in EKG report of 1957 and interpreted as a normal variant". R. at 256. The notes also stated that a "cardiac diagnosis cannot be made on [the] basis of available medical information". *Ibid.* A September 1980 VA psychiatric evaluation had presented the following diagnosis: "1. Passive-aggressive personality disorder. 2. The veteran has been diagnosed as suffering from anxiety reaction in the past. At present his anxiety reaction is only of a mild nature". R. at 257–58.

In January 1981, the RO increased to 20% the service-connected ulcer disability rating and denied service connection for heart disease. R. at 266–67. The veteran's January 1981 Notice of Disagreement (NOD) stated, inter alia: "I don't believe the VA can put my nervous condition [and] ulcer condition together." R. at 273. He requested that the VA "separate the nervous condition from the ulcer". R. at 274. He filed a VA Form 1–9, Appeal to the Board (1–9 Appeal), in May 1981. R. at 285. In December 1981, the BVA, inter alia, denied service connection for heart disease and an increase in rating for the ulcer and anxiety reaction beyond 20%. R. at 295–305. The Board considered the application of 38 C.F.R. § 4.132 as to psychotic disorders and found no impropriety in the RO's determination that the ulcer and anxiety claims were "part and parcel of the same disability" and should be rated as one disability. R. at 301–02.

A November 1981 VA medical record showed that the veteran was admitted to the VAMC in Waco from October 13, 1981, to November 10, 1981, had a diagnosis of "[g]eneralized anxiety disorder" and "[a]ngina pectoris" and that nitroglycerin and Isordil were prescribed. R. at 309–10. A VA report prepared in January 1983 by Dr. Buford contained the following diagnoses:

"Anxiety reaction, generalized, chronic, moderate." R. at 324–25. A January 1983 VA report prepared by Dr. Hildebrand assessed: "Subtotal gastrectomy for duodenal ulcer with psychophysiological GI reaction and anxiety reaction." R. at 326. In December 1985, the veteran requested "an increase in [his] disability compensation" due to his hospitalization on December 16, 1985, and stated that he also was "service connected on my anxiety which does not show on the [documents]." R. at 336. A VAMC record from January 1986 showed that the veteran had been admitted on December 16, 1985, and discharged on December 31, 1985, been diagnosed with, inter alia, "[g]eneralized anxiety disorder" on Axis I and "[c]oronary artery disease" on Axis III, and been prescribed Isordil. R. at 339–40. The 20% disability rating for ulcer and anxiety was continued in RO decisions of December 1985, February 1986, and October 1986, none of which were appealed to the BVA. R. at 342, 357, 392.

The veteran sought to reopen his claim for a heart condition in December 1986. R. at 373. In February 1987, the RO confirmed its October 1986 denial of service connection for heart disease, finding that the evidence submitted was "not new and material". R. at 380. The veteran did not appeal this decision. The veteran was hospitalized for two weeks in May 1989 at the VAMC in Dallas, Texas. R. at 397–98. The report stated that the veteran "was worked up in the month of March for T[ransient] I[schemic] A[ttack] [ (TIA) ] episodes" (ischemia is defined as "localized tissue anemia due to obstruction of the inflow of arterial blood (as by the narrowing of arteries by spasm or disease)", WEBSTER's at 353) and that "he was found to have lupus anticoagulant". R. at 397. He was admitted because he continued to have TIA episodes. The diagnosis was: "Stroke. Lupus anticoagulant with hypercoagulable state. Patient was anticoagulated with coumadin." *Ibid.* He was prescribed nine different medications upon discharge and was told to return for followup visits.

In November 1989, a VA psychiatric examination reported that the veteran's "anxiety disorder ... was already preexistent to his stroke", and resulted in the following diagno-

sis: "1. Status post stroke syndrome, mild brain condition. 2. Generalized anxiety disorder." R. at 402. In November 1989, the RO continued the 20% disability rating for the ulcer and anxiety conditions. R. at 406. The veteran filed an NOD in December 1989. R. at 408. He testified under oath in March 1990, and the RO continued the 20% disability rating in May 1990. R. at 419–29, 446.

In May 1990, the veteran requested "service connection for lupus anticoagulant, stroke (CVA) and heart problem while in service". R. at 463. A June 1990 RO decision denied service connection for lupus and CVA and denied reopening of his service-connection claim for heart disease. R. at 466–67. It stated with respect to all three conditions: "[I]nitially [they were] shown many years after the veteran was last discharged from service. No relation is shown between these conditions and the veteran's periods of active duty. Also, the conditions are not shown to be etiologically related to any condition for which service connection was previously established." R. at 466. The veteran filed an NOD in August 1990 with respect to the June 1990 RO decision. R. at 477. The RO issued a Supplemental Statement of the Case (SSOC) in September 1990 covering all issues determined in the November 1989, May 1990, and June 1990 RO decisions. R. at 480.

A medical report from the Dallas VAMC in January 1991 stated that the veteran was hospitalized from December 28, 1990, to January 22, 1991, with a diagnosis including: "Axis I. Major depression, single episode, severe without psychotic features.... Axis III. Status post left [CVA] in 1989. Transient ischemic attack. Ischemic heart disease. Hypertension. Discoid lupus." R. at 508. He was prescribed nitroglycerin, among other medications. R. at 511. The veteran wrote in a March 1991 statement:

If you will look at [the award that was issued to the appellant on February 11, 1958] very closely you will see that it is an award for my service connection nervous condition which you people in Waco have denied for years. This award does not say any thing [sic] about nervous stomach; it does say nervous condition.

R. at 505. In May 1991, the Board issued a decision remanding the case due to a defec-

tive SSOC. R. at 496–98. The RO issued a corrected SSOC in July 1991 in accordance with the Board remand. R. at 519–21.

In an August 7, 1991, statement, the veteran asserted:

#1. Heart Disease—I believe that if the [RO] would · have had the form no. 492C14795 dated Feb. 21, 1958, the decision would have been different. I have been receiving medication for my heart for over 35 years.

#2. Service connected [CVA]. I feel the same way for this as I do for no. 1.

#3. Lupus Anticoagulant. In 1957, I brought my medical records containing lab reports back from Korea. These lab reports contained blood tests taken every other day for 6 weeks that stated "unknown substances". [They] have been lost along with the letter 492C14795. Where are these lab reports?

#4. Ulcers—In 1980, at this time there was no rating for the stomache [sic], just for the nervous condition. Therefore, they cannot increase something that is non-existing. It was not until 1981 [that] the award for my stomache [sic] was given to me from 0 to 10%.

#5.—Was not in the original claim sent to Washington, D.C.[,] on January 2, 1990. Waco denied the claim. They are trying to link the two different claims together. Letter dated July 1, 1991.

R. at 527–28. An August 13, 1991, statement from the veteran (filed with respect to the travel reimbursement claim, discussed in part III, below) also referred to the missing form # 429C14795, dated February 11, 1958. Suppl.R. at 20–1. The veteran stated that this form "is the key to all the problems [he] has with the V.A.M.C. in Dallas [and the RO] in Waco", and that "this nervous condition has caused all the problems that have gone wrong in my body". Suppl.R. at 21.

According to a report of a VA examination, conducted in January 1992 due to the veteran's complaints of "a sudden onset of numbness of the right upper extremity, right lower extremity, and the right side of the face with slurred speech with hypesthesia of the entire right side of the body", the impression was "residual of hemiparesis" and "history is sug-

gestive of having coronary artery disease of a significant degree", and there was probability of "active peptic ulcer disease". R. at 564. A report of a January 1992 VA psychiatric examination, conducted for purposes of evaluating the veteran in regard to his request for an increased rating for his ulcer and anxiety conditions, contained the following diagnosis: "1. Organic brain syndrome, residuals of left [CVA]. 2. Depression, history of major episode, presently perhaps in partial remission on medication. Competent." R. at 567.

In May 1992, the RO confirmed the June 1990 RO decision with respect to all four claims. R. at 576–77. The decision stated the following with respect to whether the veteran was entitled to two separate ratings:

> The law provides that when two diagnoses, one organic and the other psychological, are presented covering the organic and psychiatric aspects of a single disability, the percentage evaluation for the major degree of disability only will be assigned. As the organic symptoms of your condition are more disabling than the psychological symptoms due to that condition, the 20% evaluation has been assigned for those organic symptoms.

R. at 577. The RO issued another SSOC in May 1992. R. at 579–82. In a June 1992 1–9 Appeal, the veteran stated:

> I still feel my problems with duodenal ulcer with psychophysiological gastrointestinal reaction has caused me much anxiety and warrents [sic] a higher rating than 20%. My last 4138 sent to you did not even cover my nervous condition.

R. at 584.

In the May 24, 1993, BVA decision here on appeal, the Board found that the claims for entitlement to service connection for heart disease, CVA, and lupus were all well grounded under 38 U.S.C. § 5107. R. at 18. With respect to reopening the claim for service connection for heart disease, the Board found that new and material evidence had not been submitted because evidence received since the final December 1981 Board decision "did not bear directly on whether heart disease had its onset in service". R. at 19. The Board found "no indication that further evidence could be obtained which would assist in the development of [the veteran's] claim". *Ibid.*

With respect to lupus, the Board found that it had not "manifested during active service or for more than 30 years following final service discharge", and thus was neither incurred in nor aggravated by active service. R. at 18. The Board noted that the veteran's contention that at one time he had records which reflected that his blood was monitored for a six-week period during active service for unknown substances did not establish that he had lupus during service. With respect to CVA, the Board found that the "evidence does not show that any cerebral vascular disorder existed during service, that the lupus anticoagulant, the cause of the [CVA], was not clinically identified until May 1989"; and that, therefore, the CVA had not "occur[red] due to a disability manifested during active service", and thus was "neither incurred in nor aggravated by active service". R. at 20, 18.

With respect to the ulcer and anxiety conditions, the Board concluded that an increased rating to 40% was warranted, and granted it as a combined rating for both the ulcer and the anxiety. R. at 18, 23–4. The Board found: "[T]he primary component of the service-connected subtotal gastrectomy for a duodenal ulcer with psychophysiological gastrointestinal reaction and anxiety is the organic rather than the psychiatric component. The veteran's psychiatric component is currently dominated by the residuals of his [CVA], a non[-]service-connected disability." R. at 23. The Board did not determine an effective date for the increased rating for service-connected ulcer and anxiety conditions.

In a July 1994 motion for leave to file a supplemental ROA out of time, the appellant advised that a June 1993 RO decision had awarded an effective date of May 14, 1990, for the increased rating for the veteran's ulcer and anxiety conditions. In August 1994, the Secretary opposed the supplemental filing and moved to strike it because it post dates the BVA decision here on appeal.

## II. Analysis of Service–Connection Claims

### A. Generally Applicable Law

▋ Pursuant to 38 U.S.C. § 5108, the Secretary must reopen a previously and finally disallowed claim when "new and material evidence" is presented or secured with respect to the basis for the denial of that claim. *See also* 38 U.S.C. § 7104(b). On claims to reopen previously and finally disallowed claims, the BVA must conduct a "two-step" analysis. *Manio v. Derwinski*, 1 Vet. App. 140, 145 (1991). The Board must first determine whether the evidence presented or secured since the prior final disallowance of the claim is "new and material" when viewed in the context of all the evidence, *see Colvin v. Derwinski*, 1 Vet.App. 171, 174 (1991), and when "the credibility of the [new] evidence" is presumed, *Justus v. Principi*, 3 Vet.App. 510, 513 (1992). If the evidence is new and material, the Board must then review the new evidence "in the context of" the old to determine whether the prior disposition of the claim should be altered. *Jones (McArthur) v. Derwinski*, 1 Vet.App. 210, 215 (1991).

▋ A Board determination as to whether evidence is "new and material" is a conclusion of law subject to de novo review in this Court under 38 U.S.C. § 7261(a)(1). *See Masors v. Derwinski*, 2 Vet.App. 181, 185 (1992); *Jones*, 1 Vet.App. at 213; *Colvin, supra*.

The Court has synthesized the applicable law as follows:

> "New" evidence is that which is not merely cumulative of other evidence of record. "Material" evidence is that which is relevant to and probative of the issue at hand and which, as this Court stated in *Colvin, supra*, ... must be of sufficient weight or significance (assuming its credibility) that there is a reasonable possibility that the new evidence, when viewed in the context of all the evidence, both new and old, would change the outcome.

*Cox (Billy) v. Brown*, 5 Vet.App. 95, 98 (1993). Lay assertions of medical causation cannot suffice to reopen a claim under 38 U.S.C. § 5108. *See Moray v. Brown*, 5 Vet. App. 211, 214 (1993). Where the determinative issue involves either medical etiology or a medical diagnosis, competent medical evidence is required to fulfill the well-grounded-claim requirement of section 5107(a); where the determinative issue does not require medical expertise, lay testimony may suffice by itself. *See Lathan v. Brown*, 7 Vet.App. 359, 365, (1995) (citing *Grottveit v. Brown*, 5 Vet.App. 91, 93 (1993)); *Magana v. Brown*, 7 Vet.App. 224, 227 (1994). This rule of law applies equally to claims to reopen. *See Moray, supra*.

▋ Pursuant to 38 U.S.C. § 5107(a), once a claimant has submitted a well-grounded claim, the Board is required to assist that claimant in developing the facts "pertinent" to the claim. 38 C.F.R. § 3.159 (1994); *Littke v. Derwinski*, 1 Vet.App. 90, 91–92 (1990). The duty to assist may, in an appropriate case, include the duty to seek to obtain pertinent private medical records. *See Masors*, 2 Vet.App. at 186–87; *Littke, supra*. But the relevance of the records sought must be demonstrated. *See Counts v. Brown*, 6 Vet. App. 473, 476 (1994); *Godwin v. Derwinski*, 1 Vet.App. 419, 425 (1991) (noting that the "duty to assist is not unlimited" and that "the duty to develop pertinent facts applies to 'all *relevant* facts'" (citation omitted) (emphasis added)). With respect to VA's duty to search for specific documents, "the duty is limited to specifically identified documents that by their description *would be* facially relevant and material to the claim". *Gobber v. Derwinski*, 2 Vet.App. 470, 472 (1992). "The VA's 'duty' is just what it states, a duty to *assist*, not a duty to prove a claim with the claimant only in a passive role.... Nor is the VA required to search for evidence which, even if obtained, would make no difference in the result. *See Colvin*, 1 Vet.App. at 174." *Ibid.* (citation omitted).

▋ Where the record does not adequately reveal the current state of the claimant's disability and the claim is well grounded, the fulfillment of the statutory duty to assist requires a thorough and contemporaneous medical examination. *See Suttmann v. Brown*, 5 Vet.App. 127, 138 (1993); *Green (Victor) v. Derwinski*, 1 Vet.App. 121, 124 (1991). Such a medical examination should "take into account the records of prior medical treatment, so that the evaluation of the

claimed disability will be a fully informed one". *Green, supra; see also Schafrath v. Derwinski,* 1 Vet.App. 589, 595 (1991); 38 C.F.R. § 4.2 (1994) ("[i]f a diagnosis is not supported by the findings on the examination report or if the report does not contain sufficient detail, it is incumbent upon the rating board to return the report as inadequate for evaluation purposes").

The Board is required to provide a written statement of the reasons or bases for its findings and conclusions on all material issues of fact and law presented on the record, *see* 38 U.S.C. § 7104(d)(1), including its denial of any assistance specifically sought by the claimant, *see Godwin,* 1 Vet.App. at 427. The statement must be adequate to enable a claimant to understand the precise basis for the Board's decision, as well as to facilitate review in this Court. *See Simon v. Derwinski,* 2 Vet.App. 621, 622 (1992); *Masors,* 2 Vet.App. at 188; *Gilbert v. Derwinski,* 1 Vet.App. 49, 57 (1990). To comply with this requirement, the Board must analyze the credibility and probative value of the evidence, account for the evidence which it finds to be persuasive or unpersuasive, and provide the reasons for its rejection of any material evidence favorable to the veteran. *See Gabrielson v. Brown,* 7 Vet.App. 36, 39–40 (1994); *Abernathy v. Principi,* 3 Vet.App. 461, 465 (1992); *Simon, supra; Peyton v. Derwinski,* 1 Vet.App. 282, 285 (1991); *Hatlestad v. Derwinski,* 1 Vet.App. 164, 169–70 (1991); *Ohland v. Derwinski,* 1 Vet.App. 147, 149 (1991); *Gilbert, supra.*

Moreover, the Board must support its medical conclusions on the basis of independent medical evidence in the record or through adequate quotation from recognized treatises; it may not rely on its own unsubstantiated medical judgment to reject expert medical evidence in the record, but may reject a claimant's medical evidence only on the basis of other such independent medical evidence. *See Thurber v. Brown,* 5 Vet.App. 119, 122 (1993); *Hatlestad v. Derwinski,* 3 Vet.App. 213, 217 (1992) (*Hatlestad II* ); *Colvin,* 1 Vet.App. at 175. "If the medical evidence of record is insufficient, or, in the opinion of the BVA, of doubtful weight or credibility, the BVA is always free to supplement the record by seeking an advisory opinion [or] ordering a medical examination".

*Colvin, supra; see Hatlestad II* and *Thurber,* both *supra; see also* 38 U.S.C. § 7109; 38 C.F.R. § 20.901(a), (d) (1994).

### B. Ulcer and Anxiety Conditions

The appellant does not contest the Board's decision to increase the disability rating from 20% to 40%, but argues that the BVA decision regarding his claim for an increased rating for his ulcer and anxiety conditions should be remanded for the *limited* purposes of assigning separate disability ratings for each condition. He maintains that VA's decision to combine the two conditions into a single condition without any supporting medical evidence, and its failure to properly consider 38 C.F.R. §§ 4.3 and 4.7 (1992), justifies a remand. The Court agrees.

First, the Court finds that the issue of the combined rating was adequately raised by the veteran before the RO and BVA prior to the decisions upon which this appeal is based, and both entities addressed the issue. *See Schafrath,* 1 Vet.App. at 595 (holding unlawful BVA's failure to acknowledge or consider regulation which was "made potentially applicable through assertions and issues raised in the record", even though it was never mentioned by claimant); *EF v. Derwinski,* 1 Vet.App. 324, 326 (1991) (VA must liberally read all documents or oral testimony submitted prior to the BVA decision). Specifically, the veteran raised below in his March and August 1991 statements as well as in his June 1992 1–9 Appeal the issue of the assignment of separate ratings for combined disabilities. R. at 505, 528, 584. The RO addressed that issue in its May 1992 decision. R. at 577. In the May 1993 decision here on appeal, the BVA addressed the issue by granting a combined rating for both the ulcer and the anxiety conditions (R. at 18, 23–4) and stating: "The primary component of the service-connected subtotal gastrectomy for a duodenal ulcer with psychophysiological gastrointestinal reaction and anxiety is the organic rather than the psychiatric component. The veteran's psychiatric component is currently dominated by the residuals of his [CVA], a nonservice-connected disability" (R. at 23).

The schedule of ratings for a duodenal ulcer is found in 38 C.F.R. § 4.114, Diagnostic Code (DC) 7305 (1994). The schedule of ratings for general anxiety disorder is found in 38 C.F.R. § 4.132, DC 9400 (1994). In determining whether a separate or a combined rating should be assigned, DC 9511 in 38 C.F.R. § 4.132 provides that psychological factors affecting physical condition are to be evaluated by the general rating formula for psychoneurotic disorders, and "Note (2)" states: "When two diagnoses, one organic and the other psychological or psychoneurotic, are presented covering the organic and psychiatric aspects of a single disability entity, only one percentage evaluation will be assigned under the appropriate diagnostic code determined by the rating board to represent the major degree of disability."

The determination to be made in applying DC 9511 Note (2) requires a medical finding that the organic and psychological diagnoses relate to the same disability. The Board cited no medical evidence to support its grouping of the two conditions together in awarding the single 40% rating. Although Dr. Hildebrand's January 1983 VA report, which included an assessment of "[s]ubtotal gastrectomy for duodenal ulcer with psychophysiological [gastrointestinal] reaction and anxiety reaction", might be read as supporting the combined rating, it is too vague for the Court to determine its meaning. In any event, as noted below, the Board's statement of reasons or bases was not adequate as to this point. Consequently, the Board erred in determining without a medical foundation that both diagnoses cover the same disability. *See Thurber, Hatlestad II,* and *Colvin,* all *supra.*

Furthermore, the Board failed to address the evidence supporting the appellant's assertion that the two conditions should be treated separately. The record shows that the veteran was diagnosed and sought service connection for each condition at different times. The Board did not discuss or note that the initial diagnosis of the veteran was for stomach problems, approximately one year before an anxiety condition was diagnosed. The first diagnosis of stomach problems was in May 1956 (R. at 97), and the veteran did not complain about anxiety until May 1957 (R. at 80). The veteran filed a claim for compensation for an ulcerated stomach in July 1957. R. at 139–42. In September 1957, when anxiety reaction was diagnosed, a "peptic ulcer [was] not found". R. at 163. Again, in November 1957, no peptic ulcer was found. R. at 165. In December 1957, the RO awarded service connection with a 0% rating for a "duodenal ulcer with anxiety reaction, mild." R. at 167. The decision noted that "[t]he service records also show treatment from 5–18–57 to 5–24–57 for an anxiety reaction and a duodenal ulcer, *both* conditions held as being incurred in line of duty." *Ibid* (emphasis added). Moreover, it was in March 1958 that the RO first awarded the veteran a 10% disability rating for his nervous condition ("formerly duodenal ulcer with anxiety reaction"). R. at 173; Suppl.R. at 22. Then, in May 1980, the veteran amended "his original claim to include service connection for his stomach ailment". R. at 199.

The BVA must address all relevant medical evidence and provide adequate reasons for its evaluation of the credibility and weight of that evidence. *See Thurber, Hatlestad II,* and *Colvin,* all *supra.* The Court finds that a remand is necessary for the Board to provide for the conduct of a medical examination of the veteran, to include a medical opinion as to whether the anxiety condition relates to the ulcer condition, or whether it is a separate disability, given the history of the various diagnoses relating to both the anxiety and the ulcer, *see Suttmann* and *Green,* both *supra; see also Shoemaker v. Derwinski,* 3 Vet.App. 248, 254–55 (1992) (Court remanded for Board to obtain examination describing relationship among various psychiatric disorders so as to allow proper determination of disability rating); and then to readjudicate the claim in a new decision supported by an adequate statement of reasons or bases. *See Thurber, Hatlestad II, Colvin,* and *Gilbert,* all *supra.*

### C. Clear and Unmistakable Error (CUE) Claims

The appellant argues essentially that CUE was committed in the 1957 and 1958 RO decisions' having erroneously linked the ulcer and anxiety conditions. *See* 38 C.F.R.

§ 3.105(a) (1994). Because this CUE claim was not raised to or adjudicated by the BVA, the Court lacks jurisdiction to review it. *See Russell v. Principi,* 3 Vet.App. 310, 315 (1992) (en banc) ("necessary jurisdictional 'hook' for this Court to act [on a CUE claim] is a decision of the BVA on the specific [CUE] issue"); *see also Lasovick v. Brown,* 6 Vet.App. 141, 152 (1994). Accordingly, the CUE claim based on these RO decisions is not properly before the Court, and the appeal in that respect must be dismissed, without prejudice to the appellant's properly raising such a CUE claim in VA's administrative adjudication process.

■ The appellant also argues that the 1981 BVA decision erroneously found no impropriety in the RO's decision which had determined that the two conditions were "part and parcel of the same disability" and rated them as one disability. Br. at 18. A CUE claim is a collateral attack on a final RO decision. *See Smith (William) v. Brown,* 35 F.3d 1516, 1521 (1994); *Duran v. Brown,* 7 Vet.App. 216, 223–24 (1994); *Talbert v. Brown,* 7 Vet.App. 352, 355–56 (1995). The CUE review authority in 38 C.F.R. § 3.105(a) relates only to review of final, unappealed agency of original jurisdiction decisions and not to those of the Board. *See Smith,* 35 F.3d at 1527. Hence, the appeal in that respect must also be dismissed for lack of jurisdiction.

### D. Heart Disease

■ The Court holds that new and material evidence has not been presented or secured so as to justify reopening the veteran's claim, previously and finally denied by the BVA in 1981, for service connection for a heart condition. Pertinent evidence submitted since that last final Board decision consists of the following: (1) a November 1981 VAMC discharge summary report containing a diagnosis of "[g]eneralized anxiety disorder" and "[a]ngina pectoris" (R. at 309); (2) a January 1986 VAMC record showing that the veteran had been hospitalized for two weeks in December 1985 with, inter alia, "[c]oronary artery disease" (R. at 339–40); and (3) a January 1991 Dallas VAMC medical report stating that the veteran was hospitalized from December 28, 1990, to January 22, 1991, with a diagnosis of, inter alia, "[t]ransient

ischemic attack", "[i]schemic heart disease", and "[h]ypertension" (R. at 508), and stating that he was prescribed nitroglycerin, among other medications (R. at 511).

The Board found that new and material evidence had not been submitted to reopen that claim because evidence received since the final December 1981 Board decision did not bear directly on whether heart disease had its onset in service. R. at 19. Reviewing the evidence de novo, the Court agrees with the Board. The Court finds that the three items are new because they were not previously of record and other evidence of record had shown "no rhythm irregularities" (R. at 145), "normal heart" (R. at 151), "no cardiac pathology" (R. at 165), "[c]hest pain of non specific type" (R. at 255), and no "evidence of active chest disease" (R. at 261). Thus, this evidence is not merely cumulative of other evidence of record.

However, none of the three items is material evidence because none is relevant to and probative of the issue at hand—whether the veteran's current heart disease is related to his service. *See Smith (Albert) v. Derwinski,* 3 Vet.App. 205, 207 (1992). Additionally, the first heart-disorder diagnosis was not made until approximately 24 years after he was discharged. Accordingly, the Court concludes that the above three items of evidence do not present a reasonable possibility of a changed outcome on the appellant's claim for service connection of a heart condition and thus are not material evidence. Although the Board incorrectly found the above items to be not new, this error was not prejudicial to the veteran because this Court holds that they were not material. *See* 38 U.S.C. § 7261(b) (Court shall take due account of rule of prejudicial error); *Yabut v. Brown,* 6 Vet.App. 79, 83 (1993); *Godwin,* 1 Vet.App. at 425.

The Court notes that, although the veteran's May 1957 SMRs had disclosed a diagnosis of "[s]inus arrhythmia, cause undetermined," and "chest pain" (R. at 80, 127, 131), a June 1957 discharge examination did not reveal any abnormalities or note any problems (R. at 133–34), and thus any suspected abnormality was not confirmed at separation. There is no medical evidence of record linking the veteran's current heart problem to

his period of active service. In addition, the Court notes that the September 1980 VA examination report stated that the examining physician was unable to evaluate the cardiac condition with respect to the veteran's service based on the medical information and thus could establish no link to service. *See* R. at 255–61.

### E. Duty to Assist

■ The appellant argues that the BVA decision with respect to the claims for service connection for heart disease, CVA, and lupus should be remanded because VA "failed to meet its statutory duty to assist [the a]ppellant in developing the facts necessary to prove his claims". Brief (Br.) at 19. In determining whether the duty to assist was breached, the Court must decide, upon a de novo review of the evidence of record, whether the documents sought by the veteran were relevant. *See Ivey v. Derwinski*, 2 Vet.App. 320, 323 (1992) (Court implicitly found private medical records pertinent in determining that VA was put on notice of the existence of the records and that VA should have sought to obtain the records); *White v. Derwinski*, 1 Vet.App. 519, 521 (1991) (same).

■ *1. Heart Condition.*—The appellant argues that VA failed to assist him in obtaining a February 21, 1958 form (No. 492C14795) which he states would support his assertion that he had been receiving medication for his heart for more than 35 years. The record reveals that in May 1957 the veteran was first prescribed nitroglycerin for chest pain (R. at 131) and that he had been prescribed heart medication at various times over the years from 1981 to the present (R. at 309, 347, 344–45, 339–40, 362, 397, 540–42). The appellant contends that he continues to take these medications to relieve chest pain. Br. at 23. Although the record shows that the veteran had received chest-pain medication while in service in May 1957, there is no evidence of heart disease or a heart problem in service. Specifically, his June 1957 discharge examination report did not reveal abnormalities or problems of any kind. R. at 133–34. Accordingly, given the 23–year postservice gap (1958–81) that would still exist in the evidence regarding the taking of such medication, the appellant has not shown how a 1958 form allegedly showing that he had then received heart medication could do more than merely corroborate the May 1957 SMR which already shows prescription of nitroglycerin for chest pain and is in the record presently before the Court.

The Court finds that any duty to assist that was generally applicable here was not violated because the appellant failed to show the relevance of the records he seeks regarding the medication gap and because such relevance is ·not readily ascertainable from the ROA. Accordingly, the Court holds that there could not be a breach of any duty to assist. *See* 38 U.S.C. § 5107(a); *Counts, Grottveit, Gobber,* and *Godwin,* all *supra.*

*2. CVA and Lupus.*—With respect to these claims, the appellant does not challenge their denial on the merits, but argues only that VA failed to assist him in obtaining certain records missing from his file, specifically laboratory reports, referred to in his August 1991 statement, regarding blood tests that he asserts showed unknown substances in his blood. He stated that he "feel[s]" that if the RO had this report, its decision denying service connection for CVA and lupus "would have been different". R. at 527.

■ Even if the laboratory report existed and confirmed the appellant's assertion that blood tests had resulted in findings that he had an unknown substance in his blood, the appellant has not shown that that evidence would establish that the CVA or lupus for which he is currently seeking benefits was incurred in or aggravated by service or that the missing report even relates to CVA or lupus disabilities. *See Counts* and *Godwin,* both *supra.* Furthermore, assuming the Court were to find these two claims well grounded, the veteran is not qualified to offer expert medical opinion on the relevance of the laboratory report and tests. *See Grottveit, supra.* Accordingly, the Court finds no breach of any duty to assist since the relevance of the documents sought has not been shown and is not readily apparent from the ROA. *See* 38 U.S.C. § 5107(a); *Counts, Grottveit, Gobber,* and *Godwin,* all *supra.*

### III. Reimbursement for the cost of unauthorized travel

#### A. Statement of Facts

In March 1991, the veteran filed a claim for reimbursement for his travel expenses to

and from a VA facility that were incurred "because of [his] nervous condition". Suppl.R. at 5. He seeks such reimbursement for travel on the following dates involved in this appeal: November 6, 16, and 30, 1990; February 2, 21, and 22, 1991; and March 27, 1991. *Ibid.* A May 1991 VA letter informed him that his request for travel reimbursement was denied because he was not treated for his service-connected conditions and there was no record of visits on November 6, 1990, and February 2, 1991. Suppl.R. at 3, 13. In August 1991, the RO issued an SSOC. Suppl.R. at 12. That same month, the veteran filed a 1–9 Appeal. Suppl.R. at 17–8. The separate May 1993 BVA decision here on appeal denied entitlement to payment or reimbursement for travel to a VAMC on the dates referred to above (R. at 11), finding that the veteran did not so travel for treatment related to a service-connected disability, and concluding that the requirements for payment or reimbursement for travel were not met under 38 U.S.C. § 1728, 38 C.F.R. §§ 17.80, 17.100, and 17.101 (1992) (R. at 9). The Board determined that the travel expenses were not authorized in advance and that 38 C.F.R. § 17.100 and § 17.101 were therefore not applicable and that the provisions of 38 U.S.C. § 1728 and 38 C.F.R. § 17.80 were required to be and were not met. R. at 10.

### B. Motion to Supplement Record

The appellant submits that the RO, in a June 6, 1993, decision, made the 40% increased rating for his service-connected ulcer and anxiety conditions effective as of May 14, 1990, which predates all of the travel dates at issue. He moves to supplement the ROA with the June 1993 RO decision. In the separate May 1993 BVA decision, discussed in part II, above, the Board did not determine an effective date for the increase to 40% it ordered for the veteran's service-connected combined ulcer and anxiety rating. Since the June 1993 RO decision, apparently assigning a May 1990 effective date, postdates the May 1993 BVA decision here on appeal, the Board has had no opportunity to address the effect of this new effective date on the veteran's entitlement to travel reimbursement.

▇ The Court is precluded by statute from considering as part of the ROA any

material which was not contained in the "record of proceedings before the Secretary and the Board." 38 U.S.C. § 7252(b); *see Rogozinski v. Derwinski,* 1 Vet.App. 19 (1990) (review in the Court shall be on the record of proceedings before the Secretary and the Board). Because material dated after the Board decision could not, in the absence of evidence substantiating that those dates were incorrect and that the material was actually generated prior to the BVA decision, have been part of the proceedings before the Secretary and the Board, its inclusion in the ROA is, presumptively, precluded by statute. Accordingly, the Court will deny the motion but will take judicial notice of the date of the decision for purposes of addressing the travel reimbursement claim. *See Brannon v. Derwinski,* 1 Vet.App. 314, 316 (1991) ("Courts may take judicial notice of facts of universal notoriety, which need not be proved, and of whatever is generally known within their jurisdictions.") (quoting *B.V.D. Licensing Corp. v. Body Action Design, Inc.,* 846 F.2d 727, 728 (Fed.Cir.1988)); *Smith (Brady) v. Derwinski,* 1 Vet.App. 235, 238 (1991) ("Courts may take judicial notice of *facts* not subject to reasonable dispute.") (citing Fed. R.Evid. 201(b) (1990)).

### C. Analysis

▇ The appellant argues that the Board erred by failing to consider and discuss adequately the statutory and regulatory provisions pertaining to travel reimbursement. In this regard, he is correct.

He further contends that under 38 U.S.C. § 111(b)(1)(B) his increased rating (40%) automatically entitles him to reimbursement for his travel expenses to and from a VA facility for treatment of any condition, and that he has satisfied the statutory requirements for travel reimbursement under that section and 38 C.F.R. § 17.100(b).

Section 111 provides:

(a) Under regulations prescribed by the President pursuant to the provisions of this section, the Secretary may pay the actual necessary expense of travel ..., or in lieu thereof an allowance based upon mileage traveled, of any person to or from a Department facility or other place ...

for the purpose of examination, treatment, or care....

(b)(1) Except as provided in subsection (c) of this section [relating to deductions] and notwithstanding subsection (g)(2)(A) of this section [the limitation in subsection (g)(2)(A) is not applicable to persons "receiving benefits for or in connection with a service-connected disability under this title"] or any other provision of law, if, with respect to any fiscal year, the Secretary exercises the authority under this section to make any payments, the Secretary shall make the payments provided for in this section to or for the following persons for travel during such fiscal year for examination, treatment, or care for which the person is eligible:

(A) A veteran or other person whose travel is in connection with treatment or care for a service-connected disability.

(B) A veteran with a service-connected disability rated at 30 percent or more.
. . . .

(3)(A) Except as provided in subparagraph (B) of this paragraph, the Secretary shall not make payments under this section for travel performed by a special mode of travel unless (i) the travel by such mode is medically required and *is authorized* by the Secretary before the travel begins, or (ii) the travel by such mode is in connection with a medical emergency of such a nature that the delay incident to obtaining *authorization* from the Secretary to use that mode of travel would have been hazardous to the person's life or health.

38 U.S.C. § 111(a), (b)(1)(A), (B), (b)(3)(A) (emphasis added); *see also* 38 C.F.R. § 17.100(b)(2) (1994) (authorizing transportation at Government expense for a "veteran with a service-connected disability rated at 30 percent or more, for treatment of any condition").

The above statutory provision relates to VA reimbursement of expenses for travel to and from VA facilities for the purpose of obtaining health care. The parties agree that the travel expenses in question were incurred with respect to such travel. The Court finds that the Board inexplicably erred as a matter of law by denying the claim on an incorrect statutory and regulatory basis, having misapplied 38 U.S.C. § 1728 and 38

C.F.R. § 17.80 to the instant facts. Those sections apply only when care is received at facilities other than those operated by VA, from "sources other than the Department", 38 U.S.C. § 1728, or "not operated by the Department", 38 C.F.R. § 17.80. As conceded by the Secretary, the travel reimbursements at issue in this case all relate to travel to and from a VAMC.

The BVA reimbursement decision concedes that the veteran has a service-connected disability rated at 40% (based on the May 1993 BVA decision which increased his ulcer and anxiety disability from 20% to 40%). R. at 10. Pursuant to 38 U.S.C. § 111(b)(1)(B) and 38 C.F.R. § 17.100(b), a veteran with a 30%-or-more disability rating is entitled to reimbursement for travel expenses to and from any VA facility for treatment of any condition. It thus appears to the Court that the appellant meets the requirement of section 111(b)(1)(B) and § 17.100(b); however, the Board failed to address or apply 38 U.S.C. § 111 in reaching its decision, and has erroneously found 38 C.F.R. §§ 17.100 and 17.101 not to be applicable. The Court holds that the BVA decision was "not in accordance with law", 38 U.S.C. § 7261(a)(3)(A), and therefore must be vacated on this ground and the case remanded to give the Board an opportunity to readjudicate the matter under the correct statutory and regulatory provisions and in light of the effective date assigned to the 40% rating by the June 1993 RO decision. *See Isenhart v. Derwinski,* 3 Vet.App. 177, 179 (1992) (matter remanded for further proceedings where the Board failed to apply controlling statutory law); *see also Massey v. Brown,* 7 Vet.App. 204 (1994) (matter remanded for Board to readjudicate using the correct DC criteria).

■ The Court holds that remand is further required for the Board to issue a decision, upon readjudication, that is fully supported by an adequate statement of reasons or bases under 38 U.S.C. § 7104(d)(1) in terms of the applicable statutory and regulatory requirements. In its decision, the Board failed to cite authority for its finding that VA health care must be preauthorized in order for 38 C.F.R. § 17.100(b) to apply. If, on remand, the Board denies the claim for

lack of prior authorization, it must discuss the reasons why the expenses were not authorized and how it reached that conclusion, and must explain how such a requirement squares with 38 U.S.C. § 111, especially in light of section 111(b)(3)(A) which contains an *express* prior-authorization provision. On remand, the Board should also explain the meaning of "prior authorization" and how it is applied to each trip to and from the VA facility on the particular dates in question. If the Board finds that the travel was not incurred for treatment of a service-connected disability, it must explain the reason why section 111 and § 17.100(b)(2) would not entitle the veteran to travel reimbursement in light of the increase of his disability rating to 40% effective, apparently, on May 14, 1992.

### D. Decision on Remand: Bernard v. Brown Prejudice Standard

In *Bernard v. Brown,* the Court held that when the Board

> addresses in its decision a question that had not been addressed by the RO, it must consider whether the claimant has been given adequate notice of the need to submit evidence or argument on that question and an opportunity to submit such evidence and argument and to address that question at a hearing, and, if not, whether the claimant has been prejudiced thereby.

*Bernard,* 4 Vet.App. 384, 394 (1993).

The Secretary contends that the appellant's claim for travel reimbursement should be remanded to the Board for appropriate action, and that "if appropriate", the Board should remand the case to the RO for further development of the record and consideration of the reimbursement issue in the context of the veteran's recently increased rating. Br. at 17–18, 27. The Secretary contends further that the issue whether the appellant is entitled to reimbursement based upon the increased rating must first be addressed by the RO and not, in the first instance, by the Board because, the Board, if it denied the claim, would be acting "in possible derogation of Appellant's due process rights and in violation of this Court's ruling in *Bernard,* [*supra* ]." Br. at 17.

In light of such fair-process and notice concerns, the Court has noted that "the Board, before undertaking a merits adjudica-tion without first remanding the matter to the RO, [should] ask if the claimant objects to such Board adjudication in the first instance, and, if so, to specify how such BVA adjudication would be prejudicial to his or her interests." *Curry v. Brown,* 7 Vet.App. 59, 67 (1994) (citing *Austin v. Brown,* 6 Vet. App. 547, 551 (1994) (BVA decision must be set aside where, at least in part, "it rests upon a medical opinion procured by a process which violates both the express holding of *Thurber* [*v. Brown, infra* ], and the fair process principle underlying *Thurber*"); *Thurber,* 5 Vet.App. at 126 (before BVA relies on any evidence developed or obtained by it subsequent to issuance of most recent SOC or SSOC, BVA must provide claimant with reasonable notice of such evidence and of reliance proposed to be placed on it and reasonable opportunity for claimant to respond to it)). "Such a procedure would ensure that the Board decision avoids the error cautioned against in *Bernard, supra.*" *Curry,* 7 Vet.App. at 67. Accordingly, the Court notes that the appellant could expressly waive such due-process rights to permit initial BVA adjudication if he wishes to do so. *See ibid.* Alternatively, the BVA decision should explain why there would be no prejudice to the appellant for the BVA to adjudicate the claim on the merits without first remanding the matter to the RO.

### IV. Conclusion

Upon consideration of the record and the pleadings of the parties, the Court dismisses the CUE claims for lack of jurisdiction. As to the May 1993 BVA decision regarding the disability-compensation claims, with one exception noted below, the appellant has not demonstrated that the BVA committed error—in its findings of fact, conclusions of law, articulation of reasons or bases, or consideration of the benefit-of-the-doubt rule—that would warrant remand or reversal under 38 U.S.C. §§ 5107(b), 5108, 7104(b), (d)(1), 7252, and 7261 and the analysis in *Gilbert, supra.* Accordingly, the Court affirms that decision in all respects, except that it vacates that decision to the extent that an examination is required for the ulcer and anxiety conditions and remands that matter for expeditious treatment consistent with this opinion and in accordance with the Veterans' Benefits Improvements Act of 1994 (VBIA), Pub.L. No.

534

103–446, § 302, 108 Stat. 4645, 4658 (1994) (requiring Secretary to ensure "expeditious treatment" for claims "remanded" by BVA or the Court), the February 16, 1995, Memorandum from J. Gary Hickman, Director, Compensation and Pension Service to Director, VA Regional Offices, *Bond v. Brown,* U.S.Vet.App. No. 93–146 [hereinafter Hickman memorandum] (notifying RO Directors of "Priority Handling of Remanded Appeals by the Court of Veterans Appeals or the [Board]" and requiring that "[a]djudication management [ ] ensure that all Court/BVA remanded cases are properly and timely handled upon receipt"), and VA ADJUDICATION PROCEDURE MANUAL, M21–1 [hereinafter Manual M21–1], Part IV, paras. 38.02, 38.03 (providing for BVA and ROs to follow flagging procedure to afford "[s]pecial handling ... for all cases remanded by the Court").

As to the Board's separate denial of the travel-reimbursement claim, the Court vacates that separate decision and remands that matter for the Board to apply all correct and applicable statutory and regulatory provisions and to issue a new decision, on the basis of all material of record, supported by an adequate statement of reasons or bases, all consistent with this opinion and in accordance with VBIA § 302, the Hickman memorandum, and Manual 21–1, Part IV, paras. 38.02, 38.03. *See* 38 U.S.C. § 7104(a), (d)(1); *Fletcher v. Derwinski,* 1 Vet.App. 394, 397 (1991).

On remand, the appellant "will be free to submit additional evidence and argument" on the remanded claims. *Quarles v. Derwinski,* 3 Vet.App. 129, 141 (1992). Any final decision by the Board following the remands herein ordered will constitute a new decision which, if adverse, may be appealed to this Court only upon the filing of a new Notice of Appeal with the Court not later than 120 days after the date on which notice of the new Board final decision is mailed to the appellant.

DISMISSED IN PART; AFFIRMED IN PART; VACATED AND REMANDED IN PART.