Citation Nr: 1456920 
Decision Date: 12/31/14 Archive Date: 01/09/15

DOCKET NO. 12-20 653 ) DATE
 )
 )

On appeal from the
Department of Veterans Affairs Regional Office in Detroit, Michigan


THE ISSUE

Entitlement to service connection for the cause of the Veteran's death. 


REPRESENTATION

Appellant represented by: Daniel G. Krasnegor, Attorney


ATTORNEY FOR THE BOARD

J. Fussell



INTRODUCTION

The Veteran had active service from April 1971 to April 1973, and he served in Vietnam from September 1971 until June 1972. 

This matter came before the Board of Veterans' Appeals (Board) from a rating decision in September 2010 of a Regional Office (RO) of the Department of Veterans Affairs (VA) which denied service connection for the cause of the Veteran's death. 

Historically, the Veteran filed an informal claim in February 2009. He subsequently filed a formal claim, VA Form 21-529, although it is not clear that this was received prior to his death. 

Unfortunately, before that claim could be adjudicated the Veteran died on November [redacted], 2009. 

In addition to the paper claims file, there are paperless, electronic claims files, Virtual VA and Veterans Benefits Management System (VBMS) associated with this appeal, a review of which does not reveal anything pertinent to the present appeal except VA treatment (CAPRI) records entered into Virtual VA in May 2011, prior to the issuance of the May 2012 Statement of the Case (SOC). 

Inasmuch as it appears that the Veteran had a pending claim for service connection at his death and that this had not been adjudicated by the RO, the Board does not have jurisdiction over the matter of possible entitlement to accrued benefits and, so, this matter is referred to the RO for initial consideration. 38 C.F.R. § 19.9(b) (2014). 



FINDINGS OF FACT

1. The Veteran served in Vietnam and is presumed to have been exposed to herbicides, including Agent Orange. 

2. The Veteran died in November 2009 and immediate cause of death was sepsis due to pneumonia but other significant conditions contributing to his death but not resulting in the underlying cause of death were acute myelogenous leukemia, thrombocytopenia, and atrial fibrillation. 

3. The greater weight of the probative evidence establishes that it is as likely as not that the Veteran's fatal acute myelogenous leukemia is the result of in-service exposure to herbicides. 


CONCLUSION OF LAW

The criteria for service connection for the cause of the Veteran's death are met. 38 U.S.C.A. §§ 1101, 1110, 1112, 1113, 1116, 1310 (West 2002); 38 C.F.R. §§ 3.303, 3.307, 3.309, 3.312 (2014). 


REASONS AND BASES FOR FINDINGS AND CONCLUSION

Background

The Veteran had active service from April 1971 to April 1973, and he served in Vietnam from September 1971 until June 1972.

The evidence shows that he was first diagnosed in 2009 as having acute myelogenous leukemia.

The Veteran died in November 2009 and immediate causes of death were sepsis due to pneumonia but other significant conditions contributing to his death but not resulting in the underlying cause of death were acute myelogenous leukemia, thrombocytopenia, and atrial fibrillation. 

At the time of the Veteran's death service connection was not in effect for any disability. 

In May 2010 Dr. Erickson reported that the Veteran had had a high grade myelodysplastic syndrome (MDS) that was transforming into acute myelogenous leukemia (AML). 

In February 2014 a medical opinion was requested from the Veterans Health Administration (VHA). A copy of the request for that opinion was provided to the appellant and her attorney. In that request it was stated, in pertinent part, that: 

The Veteran had service in the Republic of Vietnam from September 4, 1971 to June 6, 1972, and so under the law, he is presumed to have been exposed to Agent Orange while serving there. Service treatment records do not contain any diagnoses of the disorders that reportedly caused or contributed to the Veteran's death. 

The Veteran's November 2009 terminal hospital discharge summary indicates that he had had a normal blood cell count in June of that year and that in October 2009, he was found to have pancytopenia. A bone marrow biopsy showed a left shift with myeloid maturation. On referral and repeat bone marrow biopsy, early transformation to an acute myeloid leukemia was shown. The Veteran was admitted with worsening bleeding in the gums and skin. During hospitalization, chest X-rays suggested pneumonia, and changes in mental status developed. After oxygen demands worsened, he became hypotensive and an EKG revealed atrial fibrillation. 

In March 2011, one of the Veteran's private physicians, T. M. Erickson, M.D., stated that it seems possible that acute myeloid leukemia could be caused by a carcinogenic agent such as Agent Orange, noting that other hematologic malignancies such as chronic lymphocytic leukemia and multiple myeloma are recognized as conditions which could have been caused by Agent Orange exposure. 

In order to assist with the adjudication of the claim, please identify the disorders that caused and/or contributed substantially and materially to the Veteran's death and answer the following question: Is it at least as likely as not that any of the disorders that caused or contributed substantially or materially to the Veteran's death, including specifically AML, is related to the Veteran's service, to include particularly the in-service Agent Orange exposure that must be presumed to have occurred? 

Also, in Dr. Erickson's March 2011 statement it was reported, as to whether the Veteran's hepatitis C and treatment with Interferon could have contributed to his development of acute myeloid leukemia, that to the physician's knowledge there was no association with hepatitis C infection and the development of AML. The physician was also unaware of Interferon being causally linked to the development of MDS or AML.

In May 2011 Dr. Bidden reported that he was an infectious disease specialist and had treated the Veteran during his terminal hospitalization. The Veteran had MDS which had transformed to AML in a short period of time. He then developed pneumonia and sepsis most likely related to the immune dysfunction which, in turn, was related to his MDS and AML. He had a history of "HCV" for which he had been previously treated but was not known to be active at the time of his death. 

In May 2011 Dr. S. Malek reported that the Veteran had MDS and secondary acute myelogenous leukemia (sAML). His pre-existing low white cell and neutrophil counts, due to MDS and sAML, very likely conferred increased infection susceptibility and his infection ultimately led to his death. 

VHA Opinion 

In February 2014 a VA Staff Physician in Hematology and Oncology reported, in a single page, that based on the medical records provided, the Veteran was diagnosed with AML in 2009. In addressing the possible association of Agent Orange exposure in Vietnam with AML, it was stated that during 1962 to 1971, U.S. forces sprayed 11 million gallons of Agent Orange in Vietnam to defoliate trees and shrubbery. Agent Orange has been associated with several types of cancers, including hematologic malignancies such as Hodgkin's and non-Hodgkin's lymphoma, and multiple myeloma. There were no sufficient data to link Agent Orange to parental exposure to Agent Orange, however, in 2001 a 10-member committee of the U.S. National Academy of Sciences (NAS) had revoked the report in which "a miscalculation in their study had led them to erroneously conclude that children of dioxin exposed parents had a higher risk of AML. It was stated, "[i]n conclusion, with the literature at this point in time, it is at least as likely as not that AML which was part of his terminal illness, is not related to Agent Orange exposure." 

Medical Opinion of Dr. Bush

The appellant's attorney submitted a 13 page medical opinion, dated in November 2014, from a private physician, Dr. Bush. Initial RO consideration of this evidence was not waived. 

In this opinion, Dr. Bush explained that he was qualified to offer an opinion in this case because of his education, training, and experience. He had a degree in Medicine and a Pharmacy degree. He set forth his extensive training and education and noted that he was qualified to offer expert evidence in numerous forums, and had practiced medicine for over 28 years. Citation was made to numerous other medical articles and sources. 

Dr. Bush reviewed the VHA opinion and stated that the Veteran had, after service, developed MDS and secondary AML in 2009. It was noted that there was a favorable presumption of service connection for those exposed to herbicides for various diseases, including Amyloidosis and Multiple Myeloma, to which a citation was made of http://www.publichealth.va.gov/exposures/agentorange/conditions/#. 

Dr. Bush then addressed any linkage between MDS/AML and Multiple Myeloma. It was stated that Multiple Myeloma and myeloid leukemia had much in common. The names were similar because they were both cancers that began in the bone marrow. Also, many of the symptoms were similar and even some of the same drugs were used to treat both diseases. However, they were two distinctly different entities and involved different cell types. Patients with multiple myeloma and myeloid leukemia both suffered from anemia, bruising, and infections but those with multiple myelomas suffered bone fractures. 

Dr. Bush further stated that some patients with multiple myeloma later developed a type of myeloid leukemia called AML, and it was observed that scientific literature was "rife with specific examples of this." 

It was further stated, in bold typeface, that "an excess of [AML and MDS] after multiple myelomas has been known for over 4 decades." Although the underlying biologic mechanisms of AML/MDS after multiple myeloma were unknown, treatment-related factors were presumed to be responsible. It was further stated, in bold face type, that "[i]ndeed, it seems reasonable to propose that second[ary] malignancies in multiple myeloma may not be attributable solely to prior treatment. Rather, the development of second[ary] malignancies may reflect combinations of influences, including treatment-related, multiple myeloma-related, host-related, environmental, and behavioral factors." Radiation exposure increased the risk for multiple myeloma and exposure to chlorinated solvents was associated with development of non-Hodgkin's lymphoma, leukemia, and multiple myeloma. 

It was stated that MDS and AML were two distinct points on a continuum of the same malady. The distinguishing characteristic between the two was simply the number, by percentage, of "blast" cells or immature cell precursors in the bone marrow. Multiple Myeloma was also a hematologic cancer but this resulted from uncontrolled plasma cells population expansion in the lymphoid line, rather than from the myelogenous cell line seen in AML. 

Dr. Bush stated that the main area of discussion was whether or not MDS/AML was close enough to the Agent Orange presumptive disease of Multiple Myeloma to merit service connection. It was acknowledged that there was currently limited research examining the links between Agent Orange and MDS/AML and "that to date no definitive [sic] causal relationship has been established to link the two. With that said, however, I believe there is sufficient research to infer a link between the two [sic]..." VA's listing of Multiple Myeloma as presumptively due to Agent Orange but not so listing AML was largely for statistical reasons rather than established biological plausibility. That is, there simply had not been enough studies published that examined this question. This conclusion was referenced in the National Institute of Medicines 1994 publication and the 2012 Update which stated "[t]here is inadequate or insufficient evidence to determine whether an association exists between [herbicide exposure] and leukemia." 

Dr. Bush further stated that "[o]f note however, is that in the 1994 issue of this report, both Multiple Myeloma and Leukemias (including AML) [sic] were given the same 'Biologic Plausibility' for how Agent Orange exposure may lead to the disease development." Also, one of the herbicides had been shown to cause cancer in laboratory animals and if it had the same effects on cell regulation in humans, it was plausible that it could have an effect on human cancer incidence. It was noted that the 2012 Update stated that distinctions among categories was based on statistical association, and not strict causality. 

Thus, Dr. Bush state that: 

The concept I propose is that hematopietic progenitor cells exposed to environmental contaminants such as those found in Agent Orange at the right stage of development have an equally possible chance of differentiating into either the myelogenous or lymphoid cell lineages and that this exposure predisposes an individual to an equal chance of developing either Multiple Myeloma or MDS/AML. We therefore submit that MDS/AML is equivalent to Multiple Myeloma as a Presumptive Diagnosis for Agent Orange Exposure for the same reason that Multiple Myeloma is listed as a presumptive diagnosis. 

In conclusion, Dr. Bush stated that it was more likely than not that the Veteran's death was ultimately caused by MDS/AML; and that it was more likely than not that his diagnosis of MDS/AML was related to his service in Vietnam, via his confirmed exposure to Agent Orange. 

Law and Regulations

Dependency and Indemnity Compensation (DIC) is awarded if a service-connected disability was either the principal or a contributory cause of the veteran's death. 38 U.S.C.A. § 1310; 38 C.F.R. § 3.312. A principal cause of death is one which, alone or jointly with another disorder, was the underlying cause of death or was etiologically related thereto. 38 C.F.R. § 3.312(b). A contributory cause of death is one which, though not related to the principal cause, contributed substantially or materially or combined with other disorders to cause death, or aided or lent assistance to the production of death. 38 C.F.R. § 3.312(c)(1). 

Service connection is warranted for injury or disease resulting in disability was incurred in active service or, if pre-existing such service, was aggravated thereby. 38 U.S.C.A. § 1110 (West 2002); 38 C.F.R. §§ 3.303, 3.304 (2014). If a condition noted during service is not shown to be chronic, then generally a showing of continuity of symptomatology after service is required for service connection. 38 C.F.R. § 3.303(b). In addition, service connection may also be granted on the basis of a post-service initial diagnosis of a disease, where the physician relates the current condition to the period of service. 38 C.F.R. § 3.303(d). Service incurrence of a malignant tumor may be presumed if manifested to a compensable degree within one year of the veteran's discharge from service. 38 U.S.C.A. §§ 1101, 1112, 1113 (West 2002); 38 C.F.R. §§ 3.307, 3.309 (2014). 

With regard to herbicide exposure, VA laws and regulations provide that a Veteran who, during active military, naval, or air service, served in the Republic of Vietnam during the Vietnam war (Le., January 9, 1962, to May 7, 1975), shall be presumed to have been exposed to an herbicide agent, unless there is affirmative evidence to the contrary. 38 U.S.C.A. § 1116(a)(3) (West 2002); 38 C.F.R. § 3.307(a)(6)(iii). The last date on which such a Veteran shall be presumed to have been exposed to an herbicide agent shall be the last date on which he served in the Republic of Vietnam during the Vietnam era. 38 C.F.R. § 3.307. For these veterans, diseases associated with exposure to certain herbicide agents will be presumed to have been incurred in service even though there is no evidence of that disease during the period of service at issue. 38 U.S.C.A. § 1116; 38 C.F.R. §§ 3.307, 3.309. 

The list of diseases associated with exposure to certain herbicide agents includes AL amyloidosis. Hodgkin's disease; all chronic B-cell leukemias (including but not limited to, hairy-cell leukemia and chronic lymphocytic leukemia); multiple myeloma; non-Hodgkin's lymphoma; prostate cancer, respiratory cancers (of the lung, bronchus, pharynx, or trachea), and certain soft tissue sarcomas. 38 C.F.R. § 3.309(e). 

The Board must determine whether the weight of the evidence supports each claim or is in relative equipoise, with the appellant prevailing in either event. However, if the weight of the evidence is against the appellant's claim, the claim must be denied. 38 U.S.C.A. § 5107(b); 38 C.F.R. § 3.102; Gilbert v. Derwinski 1 Vet. App. 49 (1990).

Analysis

As to service connection under the presumptions found at 38 C.F.R. §§ 3.307, 3.309(e), the record shows that the Veteran served in the Republic of Vietnam from September 1971 to June 1972 which was during the Vietnam era. Therefore, he meets the threshold criteria to qualify for the presumptions found at 38 C.F.R. § 3.309(e) because he is presumed to have been exposed to herbicide agents during active service. 

The list of diseases associated with exposure to certain herbicide agents does not include the Veteran's AML or MDS. 38 C.F.R. § 3.309(e). Therefore, entitlement to service connection for the cause of the Veteran's death due to acute myelogenous leukemia on a presumptive basis must be denied. 38 U.S.C.A. § 1116; 38 C.F.R. §§ 3.303, 3.307, 3.309(e). 

As to service incurrence under 38 C.F.R. § 3.303(a), it is neither shown nor contended that the Veteran had any cancer during his active service or that any cancer manifested within one year of his April 1973 discharge from active service. Accordingly, the Board must conclude that the fatal AML was neither incurred during active service nor presumptively incurred by virtue of having manifested, as a chronic disease under 38 C.F.R. § 3.309(a), within one year of service discharge. 

Statements from the Veteran's treating physicians make it clear that neither the Veteran's nonservice-connected hepatitis C nor treatment therefor with Interferon contributed to his development of MDS or fatal AML. 

As for service connection for the fatal cancer based on the initial documentation of the acute myelogenous leukemia after service under 38 C.F.R. § 3.303(d), the record includes the VHA opinion and the private medical opinion of Dr. Bush, which address the origins or etiology of the Veteran's acute myelogenous leukemia. 

The Board must weigh the competing medical opinions on file as to whether the Veteran's fatal acute myelogenous leukemia is linked to his in-service exposure to herbicides. See Rabideau v. Derwinski, 2 Vet. App. 141,143 (1992); Schoolman v. West, 12 Vet. App. 307, 310-11 (1999); Evans v. West, 12 Vet. App. 22, 30 (1998); Owens v. Brown, 7 Vet. App. 429, 433 (1995). 

In this regard, Updates have been published which indicate the results of statistical analyses as to whether certain diseases have a statistically significant degree of occurrence in those exposed to herbicides. In this regard, in Green v. Shinseki, No. 11-2053, slip op. at 4 (U.S. Vet. App. Apr. 9, 2013) (nonprecedential memorandum decision) it was noted that such Updates were prepared by the Institute of Medicine (IOM), which is the "health arm" of the National Academy of Sciences (NAS), which is the "health arm" of the NAS. 

However, the United States Court of Appeals for Veterans Claims (Court) has held that "[t]o permit the denial of service connection for a disease on the basis that it is not likely there is any nexus to service solely because the statistical analysis does not support presumptive service connection, would, in effect, permit the denial of direct service connection simply because there is no presumptive service connection." Polovick v. Shinseki, 23 Vet. App. 48, 55 (2009); see also Stefl v. Nicholson, 21 Vet. App. 120, 123 (2007) ("[t]he availability of presumptive service connection for some conditions based on exposure to Agent Orange does not preclude direct service connection for other conditions based on exposure to Agent Orange.") (emphasis added). 

In Green, Id., service connection was claimed for cancer of the tonsils and lymph nodes which are diseases not listed as presumptively due to herbicide exposure and there were competing medical opinions. Moreover, in Green, slip op. at 4 and 5, it was noted that NAS categorized findings on the basis of whether there was no relationship of a claimed disease to herbicide exposure and, also, whether there was inadequate or insufficient evidence to determine whether such an association exists (into which tonsillar cancer fell). 

Here, Dr. Bush noted (as was noted in Green, Id.) that the statistical studies by NAS found inadequate or insufficient evidence to determine whether an association exists between herbicide exposure and AML. 

In Green, slip op. at 6, it was stated that merely because "the available studies were of 'insufficient quality, consistency, or statistical power' to support a presumptive service connection for tonsillar cancer under 38 C.F.R. § 3.309" did not preclude establishing direct service connection based on herbicide exposure. Moreover, "[u]nlike presumptive service connection-which is based on broad statistical data-direct service connection is based on the totality of the evidence in a particular veteran's case." Green, slip op. at 6. Also in Green, the credentials of the private physicians were undisputed and the nexus opinions were not "predicated on an unreliable assumption that has not been statistically or scientifically substantiated" but, rather, were based on a review of a veteran's history and medical records. 

As applied to this case, the unfavorable VHA opinion rests solely upon there not having been found by NAS a positive correlation between herbicide exposure and the development of AML. See Polovick, Id. On the other hand, the opinion of Dr. Bush noted that the NAS findings were that as to a correlation between herbicide exposure and the development of AML was placed in the inadequate or insufficient evidence to determine whether an association exists. 

The VHA opinion awkwardly stated that "it is at least as likely as not that AML ... is not related" to herbicide exposure. This suggests that there is an approximately 50 percent chance that AML is not related to herbicide exposure and the corollary to this suggests that there is an approximately 50 percent chance that AML is related to herbicide exposure. In this regard, the weight of a medical opinion is diminished where that opinion is ambivalent or where the basis for the opinion is not stated. See Reonal v. Brown, 5 Vet. App. 548 (1993); Sklar v. Brown, 5 Vet. App. 140 (1993); Guerrieri v. Brown, 4 Vet. App. 467, 470-71 (1993). 

Moreover, the negative VHA opinion merely offered a conclusory statement which does not reflect any independent rationale. As to this, the probative value of a medical opinion comes from its reasoning, and a failure to provide a rationale for an opinion goes to its weight or credibility. See Nieves-Rodriguez v. Peake, 22 Vet. App. 295, 305 (2008); Stefl v. Nicholson, 21 Vet. App. 120, 124 (2004); Herandez-Toyens v. West, 11 Vet. App. 379, 382 (1998). The probative value of a medical opinion is generally based on the scope of the review, as well as the relative merits of the expert's qualifications and analytical findings. Guerrieri v. Brown, 4 Vet. App. 467 (1993). Its weight may be less if ambivalent as to exact diagnosis or opinion, or if the examiner is not a specialist, or fails to explain the basis for an opinion. Sklar v. Brown, 5 Vet. App. 140 (1993). 

Dr. Bush set forth his extensive credentials and the Board does not doubt his expertise. He also reviewed the VHA opinion and addressed the matter of there being presumptive service connection for amyloidosis and multiple myelomas for those exposed to herbicides, in contrast to such patients that developed MDS or AML. He noted the similarities as well as dissimilarities of multiple myeloma and myeloid leukemias. Many of those with multiple myeloma developed either MDS or AML. There were several possible factors for this and while treatment of multiple myeloma was a prime suspect, there were others such as environmental factors. He then discussed, in extensive detail, the cellular pathologic processes in multiple myeloma and AML. 

Dr. Bush acknowledged that there was currently limited research examining the links between Agent Orange and MDS and AML with, as yet, no "definitive [sic] causal relationship" having been established but, nevertheless, Dr. Bus opined that "there is sufficient research to infer a link between the two [sic]..." Moreover, Dr. Bush pointed out that VA's listing of multiple myeloma as presumptive herbicide disease and not MAL was based largely for statistical data and not any established biological plausibility. He also observed that while NAS Updates had not found adequate or sufficient evidence to determine whether an association existed between herbicide exposure and leukemia, in the 1994 Update both multiple myeloma and leukemias, including AML were given the same biologic plausibility for how herbicide exposure could lead to the diseases. 

Thus, Dr. Bush found that herbicide exposure gave rise to an equally possible chance (i.e., as likely as not) that human cells would develop into either into either the myelogenous or lymphoid cancers. 

The Board need not address Dr. Bush's statement that MDS and AML were "equivalent" to multiple myeloma as an herbicidal presumptive disease because the listing of such diseases as being presumptively due to herbicide exposure is done either by statute or regulation and not on a case-by-case determination on the basis of medical evidence and opinions in individual cases. More to the point, Dr. Bush set forth an adequate rationale for his conclusion that it was more likely than not that the Veteran's death was ultimately caused by MDS and AML and that it was more likely than not that the Veteran's fatal disease(s) was related to in-service herbicide exposure. 

The Board finds the opinion of Dr. Bush to be more persuasive than the VHA opinion in this case because Dr. Bush's opinion contains (1) a clear conclusion, (2) is based on supporting data, and (3) sets forth a reasoned medical explanation connecting the two. See Stefl v. Nicholson, 21 Vet. App. 120, 124 (2007). Given these facts, the private medical opinion which weighs in favor of the claim must be given greater probative value than the negative VHA opinion. 

Since for the reasons stated the evidence in this case is at least in equipoise, the benefit-of-the-doubt rule must be applied. 38 U.S.C.A. § 5107(b) (2002); 38 C.F.R. § 3.102 (2014). Gilbert v. Derwinski, 1 Vet. App. 49 (1990); Alemany v. Brown, 9 Vet. App. 518, 519 (1996). Thus, the appellant's claim for service connection for the cause of the Veteran's death must be granted. 

Lastly, because the outcome of this case is favorable no discussion as to VA compliance with the Veterans Claims Assistance Act of 2000 (VCAA), which sets forth the duties of VA to provide notice and assistance to claimants, is required. Nor is referral of the case for initial consideration of Dr. Bush's opinion required. 


ORDER

Entitlement to service connection for the cause of the Veteran's death is granted.



____________________________________________
L. M. BARNARD
Acting Veterans Law Judge, Board of Veterans' Appeals


Department of Veterans Affairs