# UNITED STATES COURT OF APPEALS FOR VETERANS CLAIMS

No. 06-3024

DEANNA R. POLOVICK, APPELLANT,

V.

ERIC K. SHINSEKI.,
SECRETARY OF VETERANS AFFAIRS, APPELLEE.

On Appeal from the Board of Veterans' Appeals

(Argued November 5, 2008,                              Decided April 22, 2009)

*Robert V. Chisholm* of Providence, Rhode Island, with whom *Zachary M. Stolz* and *Landon Overby*, of Washington, D.C., were on the brief, for the appellant.

*Shayla McGee,* with whom *Paul J. Hutter*, Acting General Counsel, *R. Randall Campbell*, Assistant General Counsel, and *Brian Rippel,* Deputy Assistant General Counsel, all of Washington D.C., were on the brief for the appellee.

Before KASOLD, HAGEL, and DAVIS, *Judges*.

KASOLD, *Judge*: Mrs. Deanna R. Polovick, surviving spouse of Vietnam War veteran Michael J. Polovick, appeals through counsel an October 2, 2006, decision of the Board of Veterans' Appeals (Board) that denied dependency and indemnity compensation (DIC), accrued benefits, and educational benefits because it found that Mr. Polovick's death was not service connected. For the reasons set forth below, the Board's decision will be set aside and remanded for further adjudication.

# I. BACKGROUND

## A. Medical Opinions

Mr. Polovick served in the U.S. Air Force from July 1966 until April 1970, including service in Vietnam. Record (R.) at 21. In October 1993, he was diagnosed with malignant glioma[1] (a brain tumor) on the right side of his brain. R. at 66. In March 1994, he filed a claim for disability compensation for an "Agent Orange related brain tumor." R. at 53. In May 1994, the brain tumor caused Mr. Polovick's death. R. at 118.

In June 1994, Mrs. Polovick filed a claim for DIC, accrued benefits, and educational benefits, contending that Mr. Polovick's brain tumor resulted from exposure to Agent Orange. R. at 123-29. In support of her claim, Mrs. Polovick submitted the medical opinions of Dr. Alan Dixon, Dr. Craig Bash, and Dr. Huda Montemarano. Dr. Dixon, Mr. Polovick's treating physician, stated in an August 1994 opinion that Mr. Polovick's brain tumor "may well be" connected to his exposure to Agent Orange but added that he was not an expert in causation. R. at 463.

Dr. Bash provided an expert opinion for Mrs. Polovick regarding the cause of her husband's death. Dr. Bash is a board certified radiologist with additional certifications in neuroradiology. He stated that he had performed or interpreted "thousands of CT, MRI scans, PET scans and angiograms, on patients with brain tumors" correlating his findings with clinical records (R. 607, 610-17) and that it was "more likely than not" that Mr. Polovick's brain tumor was related to his exposure to Agent Orange (R. at 607). His conclusion was based on the results of what he described as a meta-analysis, or statistical synthesizing, of the studies relied on by the Institute of Medicine of the National Academies (IOM) in their *2002 Veterans and Agent Orange: Update* (2002 Agent Orange Update). R. at 608. Although the IOM concluded that the available evidence only supported placing brain tumors in the category of "Limited/Suggestive Evidence of No Association," Dr. Bash noted that this conclusion was based on a required minimum 95 percent confidence level for placing a disease in any particular category of association. Based on his own statistical analysis of the available evidence, including the IOM studies, Dr. Bash opined that it was "more likely than not" that there was an association between Mr. Polovick's brain tumor and Agent Orange exposure,

---

[1]"Glioma" is defined as "a tumor composed of tissue representing neuroglia in any of its stages of development." DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 795 (31st ed. 2007).

particularly because the period of time between Mr. Polovick's presumed exposure to Agent Orange and the onset of his brain tumor was "not inconsistent with the magnitude of time lags associated with an evolution of [this type] of tumor." *Id*.

Like Dr. Bash, Dr. Montemarano also provided an expert opinion for Mrs. Polovick in support of her claim. Dr. Montemarano, whose qualifications include a board certification in radiology and service as a section chief at Walter Reed Army Medical Center and as a clinical instructor at the Armed Forces Institute of Pathology, stated that she has been the primary care provider for hundreds of patients and has performed or interpreted various imaging studies on thousands of patients on media "includ[ing] film, CT and MRI." R. 713-17. Dr. Montemarano opined that it was "likely" that the etiology of Mr. Polovick's brain tumor was his exposure to toxins, specifically Agent Orange. R. at 713-14. Dr. Montemarano agreed with Dr. Bash's statistical analysis of the studies relied on by the IOM in the 2002 Agent Orange Update and, based on the same reasoning, stated that more recent medical literature, including the IOM's *2004 Veterans and Agent Orange: Update* (2004 Agent Orange Update), also showed a positive association between exposure to Agent Orange and the development of brain tumors. In further support for her conclusion, she noted that the interval of time between Mr. Polovick's exposure to Agent Orange and the onset of his tumor was consistent with the period of time expected for brain tumor induction and growth, that toxins such as Agent Orange cause the genetic transformations that lead to tumors, and that Agent Orange was the only risk factor for brain tumor development to which Mr. Polovick had been exposed. *Id*.

In April 2005, the Secretary sought a medical opinion from the Armed Forces Institute of Pathology (AFIP). In contrast to the above opinions, the AFIP's Dr. Florabel G. Mullick and Dr. Linda A. Murakata opined that it was "unlikely" that Mr. Polovick's brain tumor was caused by his exposure to herbicides in Vietnam. The AFIP doctors based their conclusion on the fact that the IOM's 2002 Agent Orange Update placed brain tumors in the category of "Limited/Suggestive Evidence of No Association." The AFIP report further noted that a search for more recent published studies on the relationship between herbicides and brain cancer "fails to disclose data different than that published by the [2002 Agent Orange Update]." R. at 603-04. The AFIP report did not comment on the confidence levels used by the IOM in reaching its conclusion. *Id*.

3

B. October 2006 Board Decision

The Board denied Mrs. Polovick's claim because it found that a preponderance of the evidence weighed against a finding that Mr. Polovick's brain tumor was service connected. The Board determined that presumptive service connection for the cause of Mr. Polovick's death was not warranted because glioma is not one of the diseases listed under 38 C.F.R. § 3.309 ("Diseases subject to presumptive service connection"). R. at 13. The Board further determined that service connection was not warranted on a direct basis.

In reaching the latter conclusion, the Board found the AFIP opinion more persuasive than the opinions of Dr. Dixon, Dr. Bash, and Dr. Montemarano. R. at 14. Without explanation, the Board concluded that it found Dr. Dixon's opinion to be less persuasive than the AFIP opinion. R. at 14, 15. With respect to Dr. Montemareno's opinion, the Board found that it was entitled to less weight than the AFIP report because it conflicted with the findings published in the 2004 Agent Orange Update.

With regard to Dr. Bash, the Board stated that it gave less weight to his opinion because

> [h]e did not provide copies of the work product used in arriving at his conclusions. Ill conducted meta-analyses may be biased owing to exclusion of relevant studies or inclusion of inadequate studies. The Board has no information on how his analysis was performed, or to the extent in which he included or excluded data.

R. 14. The Board concluded that in formulating his opinion Dr. Bash resorted to speculation and further concluded that the opinion did not demonstrate the direct and immediate causal relationship between herbicide exposure and the development of Mr. Polovick's brain tumor. R. at 14. The Board also dismissed Dr. Bash's theory that the 95% confidence level that Dr. Bash claims is used by the IOM to include a disease in a particular category in the 2002 Agent Orange Update was impermissibly higher than the "more likely than not" standard the Secretary employs in determining whether the facts of a case support a finding of service connection. The Board reasoned: "VA law does not require that scientific data be evaluated under VA legal standards, rather it evaluates all the data, to include the scientific and medical findings, and applies the legal standard and probative value of each item of evidence in determining [whether] a specific benefit is warranted." *Id*.

Because the AFIP opinion comported with the findings of the IOM, including those published

4

in the Agent Orange Updates, the Board found that the AFIP opinion was more persuasive than Dr. Montemareno's or Dr. Bash's. *Id*.

C. Appellant's Arguments on Appeal

Mrs. Polovick argues on appeal that the Board (1) provided an inadequate statement of reasons or bases for its determination that the opinions of Dr. Dixon, Dr. Bash, and Dr. Montemareno were less persuasive than the AFIP opinion, and (2) misinterpreted and misapplied 38 U.S.C. 5107(b).[2]

**II. LAW**

Title 38, section 1116(b)(1) of the U.S. Code directs the Secretary to "prescribe regulations providing that a presumption of service connection is warranted for [a] disease" when a positive statistical association exists between Agent Orange exposure and the occurrence of that disease in humans. The statute further provides that a positive association exists when "the credible evidence for the association is equal to or outweighs the credible evidence against the association." In making this determination the Secretary is to take into account reports from the National Academy of Sciences under section 3 of the Agent Orange Act of 1991 as well as all other available sound medical and scientific information. 38 U.S.C. § 1116(b)(3).

To carry out this directive, the National Academy of Sciences convened an IOM committee to answer, inter alia, "whether a statistical association with herbicide exposure exists." Agent Orange Act of 1991, Pub. L. No. 102-4, 105 Stat. 11 § 3(d)(1)(A) (codified as amended at 38 U.S.C. § 1116). The IOM provides an answer to this question in its biannual "Agent Orange Updates." The Agent Orange Updates recommend that section 1116(a) include a disease on its list of diseases to which the presumption applies when that disease is placed in the "Sufficient Evidence of an Association" category, but recommend against inclusion if the disease is placed in any of the Updates' remaining three categories. *See* COMM. TO REVIEW THE HEALTH EFFECTS IN VIETNAM VETERANS OF EXPOSURE TO HERBICIDES, INST. OF MEDICINE OF THE NAT'L ACADEMIES, VETERANS

---

[2] Initially, Mrs. Polovick also argued that the Board member rendering the Board decision in this case provided an inadequate statement of reasons or bases for explaining why she did not recuse herself from the proceedings. However, Mrs. Polovick withdrew that argument prior to oral argument.

AND AGENT ORANGE: UPDATE 2002 (Fourth Biennial Update 2003) (noting that the remaining three categories are "Limited or Suggestive Evidence of an Association," "Inadequate or Insufficient Evidence to Determine Whether an Association Exists," and "Limited or Suggestive Evidence of No Association").

Even though a disease is not included on the list of presumptive diseases, a nexus between the disease and service may nevertheless be established on the basis of direct service connection. *See Stefl v. Nicholson*, 21 Vet.App. 120, 123 (2007) ("The existence of presumptive service connection for a condition based on exposure to Agent Orange presupposes that it is possible for medical evidence to prove such a link before the National Academy of Sciences recognizes a positive association."). Of particular relevance to an analysis of medical evidence supporting such a nexus are factors such as whether a medical professional finds studies persuasive, whether there are other risk factors that might be the cause of the condition for which benefits are sought, and whether the condition has manifested itself in an unusual manner. *Id*. at 124.

When rendering its decision, the Board is statutorily required to provide a statement of reasons or bases for its findings and conclusions. 38 U.S.C. § 7104(d)(1); *Allday v. Brown*, 7 Vet.App. 517, 527 (1995). In addition to analyzing the credibility of the evidence and accounting for the evidence it finds persuasive and unpersuasive, the Board's statement of reasons or bases must be descriptive enough to allow a claimant to understand the precise basis for the Board's decision, as well as to facilitate judicial review. *Allday*, *supra*; *Gabrielson v. Brown*, 7 Vet.App. 40 (1994) (noting that the Board's statement of reasons or bases "serves a function similar to that of cross-examination in adversarial litigation").

### III.  ANALYSIS

A.  Statistical Analysis and Direct Service Connection

At the outset, we note that in the arena of diseases caused by Agent Orange, Congress has premised presumptive service connection on statistical analysis. Specifically, 38 U.S.C. § 1116(b)(1) directs the Secretary to "prescribe regulations providing that a presumption of service connection is warranted for that disease" when a positive statistical association exists between Agent Orange exposure and the occurrence of a disease in humans. The statute further provides that a

6

positive association exists when "the credible evidence for the association is equal to or outweighs the credible evidence against the association" and that in making this determination the Secretary is to take into account reports from the National Academy of Sciences under section 3 of the Agent Orange Act of 1991 as well as all other available sound medical and scientific information. 38 U.S.C. § 1116(b)(3). To carry out this directive, the National Academy of Sciences convened an IOM committee to answer, inter alia, "whether a statistical association with herbicide exposure exists [with respect to a particular disease ]." Agent Orange Act of 1991, Pub. L. No. 102-4, 105 Stat. 11 § 3(d)(1)(A) (codified as amended at 38 U.S.C. § 1116).

To require the Secretary to grant service connection for disabilities based on the opinion of individual doctors that there is a statistical correlation between Agent Orange exposure and a disease not otherwise on the Secretary's list of diseases presumptively caused by Agent Orange would circumvent the congressional mandate that the Secretary designate a disease as presumptively caused by Agent Orange when "the credible evidence for the association is equal to or outweighs the credible evidence against the association." *See Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 19-20 (1979) (determining that where a statute specifies particular remedies, courts must be wary of expanding available remedies beyond those explicitly provided by Congress). It would also permit the opinions of individual doctors to trump the collective view of experts on this issue. *See Nehmer v. U.S. Veterans' Admin.*, 712 F.Supp. 1404, 1412 (9th Cir. 1989) ("a group of experts' decisions regarding which scientific studies are the most pertinent to understanding the health effects of Agent Orange exposure is perhaps the epitome of a scientific determination which this court is ill-equipped to review"); *Reynolds Metals Co. v. EPA*, 760 F.2d 549, 560 (4th Cir.1985) (noting that a court does not "sit as a scientific body minutely comparing competing research methods and results").

This is not to say that statistical analysis cannot be a factor to consider when assessing whether the totality of the evidence is sufficient to establish direct service connection, even when the statistical analysis alone would be insufficient to warrant adding a disease to the section 1116(a) list of diseases for presumptive service connection. *Stefl*, *supra*. However, it cannot be the sole basis for such a determination. Moreover, a medical professional's opinion cannot be rejected simply because the opinion is based in part on statistical analysis. Rather, it is the total analysis provided

by the medical professional that must be weighed and considered by the Board. *Id*; *see also Allday*, *supra*.

### B. Reasons or Bases for the Medical Opinions of Dr. Dixon,
### Dr. Montemarano, Dr. Bash, and the AFIP

#### 1. Opinion of Dr. Dixon

Although the Board did not explicitly state why it gave greater weight to the AFIP report than to Dr. Dixon's report, the Board noted that Dr. Dixon opined only that Mr. Polovick's brain tumor "may well be" connected to his exposure to Agent Orange and further caveated that he was not an expert on causation. Thus, the opinion was speculative and cannot support a finding of direct or presumptive service connection. *See McLendon v. Nicholson*, 20 Vet.App. 79, 85 (stating that a speculative medical opinion as to causation cannot establish a medical nexus to service); *Bloom v. West*, 12 Vet.App. 185, 187 (1999) (use of the term "could," without other rationale or supporting data, is too speculative to support award of benefits); *Tirpak v. Derwinski*, 2 Vet.App. 609, 611 (1992) (holding that medical opinions are speculative and of little or no probative value when a physician makes equivocal findings such as "the veteran's death may or may not have been averted"); 38 C.F.R. § 3.102 (2008) (Board may not award benefits when the award would be based upon pure speculation). Under such circumstances, the Board's overall statement permits appellate review as well as an understanding of its weighing of the evidence, and remand for further clarification is not warranted. *See Allday, supra; Soyini v. Derwinski*, 1 Vet.App. 540, 546 (1991) (remand is unnecessary when it "would result in this Court's unnecessarily imposing additional burdens on the [Board and the Secretary] with no benefit flowing to the veteran").

#### 2. Opinion of Dr. Montemarano

The record supports Mrs. Polovick's argument that the Board provided an inadequate statement of reasons or bases for discounting Dr. Montemarano's opinion. The Board stated that it afforded less weight to Dr. Montemarano's opinion because it did not comport with the conclusions reached by the IOM in the 2004 Agent Orange Update. R. at 15. However, the IOM reports are based on general statistics and used for purposes of determining whether there is sufficient nexus between a disease and Agent Orange to warrant placing the disease on the list of presumptive diseases under section 1116(a). In contrast, Dr. Montemarano's opinion was based not only on her

own review of those statistics, but on her added opinion, as noted above, that the interval of time between Mr. Polovick's exposure to Agent Orange and the onset of his tumor was consistent with the period of time expected for brain tumor induction and growth, that toxins such as Agent Orange cause the genetic transformations that lead to tumors, and that Agent Orange was the only risk factor for brain tumor development to which Mr. Polovick had been exposed during his lifetime. Accordingly, the Board's statement of reasons or bases for rejecting Montemarano's opinion with regard to direct service connection – solely because it was not consistent with the data assembled in the IOM's 2004 Agent Orange Update for presumptive diseases – is inadequate. *Stefl* and *Allday*, both *supra*.

### 3. Opinion of Dr. Bash

The record also supports Mrs. Polovick's assertion that the Board provided an inadequate statement of reasons or bases for its determination that Dr. Bash's medical opinion should be accorded less weight than the AFIP opinion. The Board discounted Dr. Bash's opinion because it conflicted with the IOM findings, as published in the Agent Orange Updates, and because he did not provide copies of his work product. As with Dr. Montemarano's opinion, to the extent the Board assigned less weight to Dr. Bash's opinion on direct service connection because it did not comport with the conclusions reached by the Agent Orange Updates for presumptive service connection, the Board's decision is inadequate. *See Allday* and *Gabrielson*, both *supra*.

### 4. AFIP Report

The Board's statement of reasons or bases for its reliance on the AFIP report also is inadequate. Succinctly stated, the AFIP physicians' opinion that Mr. Polovick's brain tumor was not directly related to service is based solely on the fact that this disease is listed in the "Limited Evidence of No Association" category in the 2002 Agent Orange Update. However, the Agent Orange Updates use only a general statistical analysis to determine whether a disease should be service connected on a presumptive basis. *See* Introduction to 2002 Agent Orange Update (stating that the conclusions reached in the Update "are related to associations between exposure to chemicals and health outcomes in human populations, not to the likelihood that any individual's health problem is associated with or caused by the herbicides in question"). Moreover, the report provides no discussion of whether Mr. Polovick himself experienced any risk factors for the

9

development of glioma, whether the time lag between exposure to Agent Orange and development of his brain tumor was consistent with the amount of time generally noted for tumor development, or why the AFIP physicians found the conclusions reached by Agent Orange Updates to be persuasive. R. at 596-97; *Stefl*, 21 Vet.App. at 124 (providing examples of points that may be discussed in a direct service connection examination report).

To permit the denial of service connection for a disease on the basis that it is not likely there is any nexus to service solely because the statistical analysis does not support presumptive service connection, would, in effect, permit the denial of direct service connection simply because there is no presumptive service connection. This is contrary to the recognition in *Stefl* that "[t]he existence of presumptive service connection for a condition based on exposure to Agent Orange presupposes that it is possible for medical evidence to prove such a link before the National Academy of Sciences recognizes a positive association." *Stefl*, 21 Vet.App. at 124 . Having sought a medical opinion, the Secretary is required to provide an adequate one, or otherwise explain why one is not necessary. *Daves v. Nicholson*, 21 Vet.App. 46 (2007).

### C. Interpretation and Application of Section 5107(b)

Mrs. Polovick also argues that the Board misinterpreted and misapplied 38 U.S.C. § 5107(b)'s benefit of the doubt principle. However, her argument is rendered moot by the Court's determination that remand is warranted for the Board to provide adequate reasons or bases for its assessment of the evidentiary value of Dr. Montemarano's opinion, Dr. Bash's opinion, and the AFIP report. *See Dunn v. West*, 11 Vet.App. 462, 467 (1998) (remand of appellant's claim under one theory moots the remaining theories advanced on appeal); *see also Fletcher v. Derwinski*, 1 Vet.App. 394, 397 (1991) ("A remand is meant to entail a critical examination of the justification for the decision.")

### D. Remand

On remand, Mrs. Polovick may present, and the Board must consider, any additional evidence and argument in support of the matters remanded. *See Kay v. Principi*,16 Vet.App. 529, 534 (2002). These matters are to be provided expeditious treatment on remand. *See* 38 U.S.C. § 7112.

## IV. CONCLUSION

For the foregoing reasons, the October 2, 2006, decision of the Board is SET ASIDE and the matters REMANDED for further adjudication consistent with this opinion.