# UNITED STATES COURT OF APPEALS FOR VETERANS CLAIMS

No. 17-1875

DONALD V. MCCRAY, APPELLANT,

V.

ROBERT L. WILKIE,
SECRETARY OF VETERANS AFFAIRS, APPELLEE.

On Appeal from the Board of Veterans' Appeals

(Argued November 1, 2018                                          Decided June 18, 2019)

*Maxwell D. Kinman*, of Mason, Ohio, for the appellant.

*Mark Villapando*, with whom *Meghan Flanz*, Interim General Counsel; *Mary Ann Flynn*, Chief Counsel; and *Emily Purcell,* Acting Deputy Chief Counsel, all of Washington, D.C., were on the brief for the appellee.

Before DAVIS, *Chief Judge*, and SCHOELEN and BARTLEY, *Judges.*

BARTLEY, *Judge*: Veteran Donald V. McCray appeals through counsel a June 9, 2017, Board of Veterans' Appeals (Board) decision denying service connection for a bilateral hearing loss disability. Record (R.) at 2-17. This appeal is timely and the Court has jurisdiction to review the Board decision pursuant to 38 U.S.C. §§ 7252(a) and 7266(a). This matter was referred to a panel of the Court to address the Board's dependence on a negative VA medical opinion that relied on a medical text containing unfavorable findings as well as apparently contradictory findings regarding delayed-onset hearing loss. The Court holds that a medical text's qualifying or contradictory aspects may affect the probative value and adequacy of any ensuing medical opinion that relies on the text. Because the Board erred in failing to assess the impact of apparently qualifying or contradictory statements in the medical text on the probative value and adequacy of the negative VA medical opinion, the Court will set aside the June 2017 Board decision as to Mr. McCray's left ear hearing loss and remand the matter for additional development, if necessary, and readjudication consistent with this decision. As to his claimed right ear hearing loss, the Court will likewise set aside the June 2017 Board decision and remand that matter for the Board to comply with its statutory reasons or bases obligation.

# I. FACTS

Mr. McCray served on active duty in the U.S. Army from June 1973 to June 1977. R. at 1273. During service, his military occupational specialty was cannon field fire support specialist. *Id*. In Board testimony, he indicated that he was basically an artilleryman and also served as a "gun or section chief," a motor officer in connection with artillery, and a special weapons assembler, and had significant noise exposure in service almost every day. R. at 608. He provided lay statements describing in-service exposure to noise from artillery rounds, hand guns, M16 rifles, and engine noise; and no exposure to loud noise post-service while working in a financial services office after college. R. at 22, 611, 869.

At entrance into service in June 1973, Mr. McCray did not report a history of ear problems and the entry audiogram reflects normal hearing. R. at 1005, 1009. Interim audiograms in November and December 1976 showed bilateral hearing loss for VA purposes and left ear hearing loss for VA purposes, respectively. R. at 1037; *see* 38 C.F.R. § 3.385. At a March 1977 separation examination, Mr. McCray denied hearing loss but reported a history of problems with his ears. R. at 995. The exit audiogram showed hearing within normal limits bilaterally with thresholds the same or better than those shown at enlistment. R. at 1001. In June 1977, he certified that there had been no change in his medical condition since his earlier separation examination. R. at 1034.

Treatment records from the years immediately following Mr. McCray's separation from service are not available. R. at 1310-11. From July 2005 to December 2008, Mr. McCray saw Dr. Charles R. Leach, whose treatment records show that the veteran denied ear problems and that his hearing was grossly normal. *Id*. VA treatment records from more recent years show hearing loss as early as June 2009. R. at 900. At an October 2009 VA audiology consultation, Mr. McCray denied having worn a hearing aid but reported left ear hearing loss for many years prior due to a cannon exploding on his left side while he was in service. R. at 577.

Mr. McCray filed a service-connection claim for bilateral hearing loss in March 2010, R. at 1094, and attended a July 2010 VA examination in which the examiner diagnosed mild left ear sensorineural hearing loss and found no right ear hearing loss for VA purposes. R. at 841. The examiner noted that there was no threshold shift between service entrance and separation and therefore offered a negative medical linkage opinion. *Id*. In August 2010, a VA regional office denied the claim, R. at 1302-12, and Mr. McCray appealed, R. at 741, 869.

At a December 2012 Board hearing, Mr. McCray testified that he noticed hearing loss while in service, R. at 1304, and sought treatment following service as early as 1979 but was told that his hearing loss would continue to be a problem and get worse, R. 1305-06. He also testified that after service he held an office job for a financial services company. R. at 1307. Mr. McCray's wife testified that she has known him for 20 years, since about 1992, and that he has had hearing problems the entire time. R. at 1308.

In a January 2013 private audiology report by Dr. Judith A. Caudle, Mr. McCray was diagnosed with mild to moderate right ear sensorineural hearing loss and mild to profound left ear sensorineural hearing loss, with Maryland CNC speech recognition scores of 80% in the right ear and 76% in the left ear. R. at 630. Dr. Caudle reviewed Mr. McCray's service records, noting his work with artillery, and his report of wearing hearing amplification directly following service. *Id.* She opined that his hearing loss was related to service because he was exposed to excessive in-service noise levels without the benefit of hearing protection and he demonstrated in-service decreased hearing threshold levels. *Id.*

In November 2013, the Board remanded the case for a new VA examination and medical opinion. In December 2013, VA audiologist Dr. Ashley Trotter found no right ear hearing loss for VA purposes but diagnosed left ear sensorineural hearing loss and concluded that there was no link to service. As her rationale, she noted that Mr. McCray had a normal entrance and separation examination and two 1976 in-service audiograms that found "transient hearing loss" and were "highly suggestive of questionable or non-organic results." R. at 220. Finally, she cited a 2005 Institute of Medicine (IOM) report entitled *Noise and Military Service: Implications for Hearing Loss and Tinnitus,* finding that noise-induced hearing loss occurs immediately and there is no scientific support for delayed onset noise-induced hearing loss. R. at 489. Dr. Trotter offered a May 2014 addendum to her opinion stating that her opinion remained negative as to linkage evidence to service. She again characterized the veteran's November 1976 and December 1976 audiogram results as "transient" hearing loss, noted middle ear problems Mr. McCray had experienced that could contribute to transient hearing loss, and repeated that, based on normal hearing at separation from service and the IOM report conclusion, there is no scientific support for delayed onset noise-induced hearing loss. R. at 489.

Dr. Trotter also questioned the accuracy of Dr. Caudle's finding regarding the severity of Mr. McCray's right ear hearing loss. Dr. Trotter noted that the audiogram Dr. Caudle relied on for

3

her opinion was not performed in a government facility, making it unclear whether Dr. Caudle followed VA's protocol for hearing loss examinations. *Id*. Finally, Dr. Trotter stated that Dr. Caudle's audiometric test results regarding the right ear were inconsistent with the results of the 2010 and 2013 VA examiners. *Id*.

The Board again denied service connection for bilateral hearing loss in October 2014, and the subsequent appeal to this Court was resolved by a joint motion for remand (JMR) in September 2015 for the Board to consider Dr. Caudle's private audiology opinion. R. at 174-78. In his May 2015 brief filed with this Court, Mr. McCray argued, among other things, that the Board's reliance on the December 2013 opinion and May 2014 addendum was error because the VA examiner's conclusion misled the Board as to the contents of the IOM report. In particular, Mr. McCray noted that, after finding that delayed-onset hearing loss after noise exposure was unlikely "based on the anatomical and physiological data available," the report went on to also find that "[t]here is not sufficient evidence from longitudinal studies in laboratory animals or humans to determine whether permanent noise-induced hearing loss can develop much later in one's lifetime, long after the cessation of that noise exposure" and that "definitive studies to address this issue have not been performed." R. at 147. Counsel included in an appendix a three-page excerpt from the IOM report, namely, pages 42, 203, and 204.

A September 2015 VA audiologist conducted an audiological evaluation and concluded that Mr. McCray's hearing thresholds for his right ear were normal and that he had "excellent" (100%) speech discrimination. R. at 63. The VA audiologist diagnosed Mr. McCray with a mild to profound sensorineural hearing loss in his left ear with "poor" (68%) speech discrimination. *Id*.

In May 2016, the Board remanded the case for a second addendum opinion from Dr. Trotter, which she provided in June 2016. R. at 110-14. She again cited the lack of threshold shift during service, Mr. McCray's normal hearing at separation from service, and the IOM report, in repeating her negative medical linkage opinion. R. at 40-41. Dr. Trotter reiterated that she was unsure whether Dr. Caudle's private audiologic results were conducted following VA protocol and that Dr. Caudle's test results were inconsistent with VA results. *Id*. Finally, she remarked that perhaps Dr. Caudle was unaware of the IOM conclusion that there was no sufficient scientific basis for the existence of delayed-onset hearing loss. R. at 41.

In the June 2017 decision on appeal, the Board conceded in-service acoustic trauma and found the December 2013 medical opinion and June 2016 addendum adequate and probative and

4

denied service connection for left ear hearing loss based on that opinion. R. at 6-9. As to his right ear, the Board found no current diagnosis of hearing loss for VA purposes. R. at 16. The Board considered Dr. Caudle's opinion of limited probative value. R. at 14. This timely appeal followed.

## II. ANALYSIS

### A. Preliminary Matter—The Secretary's *Carter* Argument

The Court first directs its attention to the Secretary's argument, relying on *Carter,* that the Court should refuse to hear Mr. McCray's merits arguments. *See Carter v. Shinseki*, 26 Vet.App. 534, 542-43 (2014), *rev'd on other grounds by Carter v. McDonald*, 794 F.3d 1342 (Fed. Cir. 2015). The Court concluded in *Carter* that when a represented veteran enters into a JMR that contains clear and precise directions for the Board, the JMR provides guidance as to the issues to be addressed on remand. Referencing *Carter,* the Secretary asserts that, although Mr. McCray raised the IOM report argument in his May 2014 brief to the Board, because the argument wasn't included in the September 2015 JMR filed with this Court he should be precluded from raising it now due to piecemeal litigation concerns. Secretary's Br. at 9-10. Mr. McCray responds that, because in the JMR the parties explicitly agreed to allow the submission of additional evidence and argument and did not foreclose any avenues of relief or argument below, the Court should hear the arguments raised in his initial brief, including his IOM report contention. Reply Br. at 3-4.

For several reasons, the Court is unconvinced by the Secretary's argument. First, although the IOM report arguments were not specifically included as bases for remand in the September 2015 JMR, the parties included a provision clearly authorizing the veteran to present additional argument below and requiring that the Board "reexamine the evidence of record, seek any other evidence the Board feels is necessary, and issue a timely, well-supported decision in this case." R. at 177. The Court in *Carter* was clear that, even though the terms of a JMR may narrow the Board's focus on remand, the parties' agreement that the Board committed a specific error doesn't foreclose a claimant from raising additional arguments when the JMR so provides. *Carter*, 26 Vet.App. at 543. Because the JMR at issue here made such allowances and did not limit Mr. McCray's future contentions solely to the issue that was the subject of the September 2015 remand, the Court finds the veteran's arguments on this matter persuasive. *See Carter,* 26 Vet.App. at 543 ("the parties could have limited the Board's duties on remand by using clear language describing the limitation"). Additionally, unlike the appellant in *Carter*, who had the same attorney throughout

5

Board and Court proceedings, when Mr. McCray agreed to the September 2015 JMR he was represented not by current counsel but by a different attorney. Not only that, Mr. McCray was unrepresented by counsel on remand to the Board in June 2017. R. at 2 (June 2017 listing a veterans service organization as holder of his power of attorney). Because these features concerning Mr. McCray's September 2015 remand and June 2017 Board decision serve to distinguish his case and weigh against any limitation as to his arguments, the Court will proceed to hear the merits of his IOM report argument.

B. The Parties' Contentions and the IOM Report

Mr. McCray argues that Dr. Trotter's opinion and addendum indicate that the IOM report concluded that there's no sufficient knowledge base for the existence of delayed-onset hearing loss, while "it is clear that the [report] actually states that there simply [have not] been any studies on delayed onset hearing loss." Appellant's Br. at 12 (citing R. at 150-152). He contends that "the [report] clearly states that there 'is little evidence available with which to address [the] question'" of whether there can be delayed-onset hearing loss long after acoustic trauma. *Id.* (citing R. at 152). He maintains that the fact that definitive scientific studies on delayed-onset hearing loss have not been performed shows that the scientific community has not definitely determined that delayed onset-hearing loss is not possible. Appellant's Br. at 14 (citing *Wise*, 26 Vet.App. at 532). Essentially, Mr. McCray argues that the Board's acceptance of the negative VA medical opinion effectively requires the Board to treat the absence of evidence in the IOM report as though it were conclusive negative evidence that settled the delayed-onset hearing loss issue. Appellant's Br. at 12.

Among other things, the Secretary responds that Mr. McCray fails to show that the Board's reference to the IOM report was improper, takes issue with the veteran's characterization of the report, and asserts that interpretation of the report is Board fact finding that should stand so long as it has a plausible basis in the record.

An excerpt of the IOM report, consisting of three printed pages, was added to Mr. McCray's claims file between October 2015, the date the Court approved the parties' JMR, R. at 174-79, and May 2016, when the Board, pursuant to the JMR, issued an order remanding the claim to the AOJ for an addendum opinion, R. at 110-114. It was originally attached to the brief filed with this Court in relation to Mr. McCray's 2014 appeal. R. at 134-153. Following are the relevant portions of the IOM report that the veteran appears to refer to in his initial brief in this case:

*Finding: The evidence from laboratory studies in humans and animals is sufficient to conclude that the most pronounced effects of a given noise exposure on puretone thresholds are measurable immediately following the exposure, with the length of recovery, whether partial or complete, related to the level, duration, and type of noise exposure. Most recovery to stable hearing thresholds occurs within 30 days.*

*Finding: There is not sufficient evidence from longitudinal studies in laboratory animals or humans to determine whether permanent noise-induced hearing loss can develop much later in one's lifetime, long after the cessation of that noise exposure. Although the definitive studies to address that issue have not been performed, based on the anatomical and physiological data available on the recovery process following noise exposure, it is unlikely that such delayed effects occur.*
. . . .

**4.      What is the evidence that the effects of noise exposure at younger ages can lead to delayed onset of noise-induced hearing loss later in life?**

There is little evidence available with which to address this question (Chapter 2). No longitudinal studies have examined patterns of hearing loss over time in noise-exposed humans or laboratory animals who did not develop hearing loss at the time of the noise exposure. The committee's understanding of the mechanisms and processes involved in the recovery from noise exposure suggests that a delay of many years in the onset of noise-induced hearing loss following an earlier noise exposure is extremely unlikely.

When hearing loss is known to have occurred as a result of a noise exposure, it has generally been thought that hearing loss for pure tones does not worsen following the cessation of a given noise exposure. However, there are no longitudinal data from humans who developed noise-induced hearing loss in early adulthood and were followed into their 60s, 70s, or 80s. Data from a few longitudinal studies of older adults, which differed in the way prior noise exposure was documented, have not produced conclusive results. To the committee's knowledge, only one longitudinal study has examined changes in hearing in laboratory animals after a noise-induced hearing loss. In middle-aged gerbils that sustained slight noise-induced hearing loss and were followed for most of their remaining lifetimes, no change in the amount of noise-induced hearing loss was seen over time.

R. at 151-52.

In the VA examiner's June 2016 addendum, she stated, as she had in her December 2013 opinion and May 2014 addendum, that

[b]ased on the Institute of Medicine Report on noise exposure in the military[,] which concluded that[,] based on current knowledge[,] noise induced hearing loss (NIHL) occurs immediately, i.e.[,] there is no scientific support for delayed onset NIHL weeks, months, or years after the exposure event, and given the veteran's hearing was within

normal limits at time of separation exam, his current hearing loss is LESS LIKELY than not a result of military noise exposure.

R. at 43.

The Board discussed the June 2016 VA addendum opinion, noting that it "relied upon the study done by the [IOM] entitled 'Noise and Military Service-Implications for Hearing Loss and Tinnitus (2006)' [and] concluded that based on current knowledge of cochlear physiology there was no sufficient scientific basis for the existence of delayed-onset hearing loss." R. at 13. The Board then assessed the probative value of the June 2016 addendum opinion as follows:

> The Board finds the [2016] examiner's opinion as to no hearing loss at service separation to be sound and supported by adequate rationale. The opinion regarding the current left ear hearing loss [being] not related to his service was rendered following a review of the Veteran's pertinent history and the examination of the Veteran, and the examiner's opinion is well supported. It is considered to be the most probative evidence as to the issue of etiology of left ear hearing loss and is given controlling weight. For these reasons, the claim is denied.

R. at 17.

## C. Recap of Probative Value and Adequacy Principles

The probative value of evidence is its "tendency . . . to establish the proposition that it is offered to prove. Evidence has probative value if it tends to prove the issue in dispute." *Washington v. Nicholson*, 19 Vet.App. 362, 368 (2005) (citing *United States v. Welsh*, 774 F.3d 670, 672 (4th Cir. 1985)). Under the Board's reasons or bases statutory requirement, 38 U.S.C. § 7104(d)(1), and long-standing caselaw, the Board is obligated to analyze the probative value of evidence of record and account for evidence it finds persuasive or unpersuasive. *Caluza v. Brown*, 7 Vet.App. 498, 506 (1995), *aff'd per curiam*, 78 F.3d 604 (Fed. Cir. 1996) (table). These obligations necessarily require that, when the Board relies on evidence unfavorable to a claimant, it must explain why such evidence has persuasive value as to the issue at hand. In other words, the Board must not only make probative-value assessments as to the favorable and unfavorable evidence relied on, it must also provide adequate reasons or bases for such probative-value assessments.

The Court has assessed the adequacy of medical evidence in various ways, but all cases appear to focus on a few common elements. Many early cases cite the VA regulation that explicitly addresses adequacy, 38 C.F.R. § 4.2 (2018), which provides that, if the findings in an examination report are not supported or if the report does not contain sufficient detail, VA adjudicators must return the report as inadequate for evaluation purposes. *See Green v. Derwinski*, 1 Vet.App. 121,

8

124 (1991).  As discussed in greater detail below, our view of adequacy has evolved through caselaw, but the Court has preserved and applied these basic principles.

### 1. Medical Text Evidence

VA disability compensation cases may involve not only medical opinion evidence but also "sound medical principles found in medical treatises" and "statements contained in authoritative writings such as medical and scientific articles and research reports or analyses."  38 C.F.R. § 3.159(a)(1) (2018) (defining "medical evidence" for VA adjudication purposes).  Here we refer to such documents as medical text evidence.

The Court cautioned early on that, to be useful in compensation claims, a medical text must do more than provide speculative generic statements about a disability or the relationship between a disability and purported causal factors.  *Wallin v. West*, 11 Vet.App. 509, 514 (1998) (addressing the issue in the context of the former well-grounded claim requirement).  An excerpt from a generic medical text that doesn't apply medical principles regarding causation or etiology to the facts of the individual veteran's case generally won't provide sufficient evidence, standing alone, to serve as the basis for an award of service connection.  *Libertine v. Brown,* 9 Vet.App. 521, 523 (1996).  Nonetheless, the Court has recognized that medical texts can provide "important support" for service connection, particularly when interpreted by a medical professional.  *Sacks v. West*, 11 Vet.App. 314, 317 (1998) (citing *Rucker v. Brown*, 10 Vet.App. 67, 73-74 (1997), and *Bielby v. Brown*, 7 Vet.App. 260, 265-67 (1994)).

Moreover, in *Harvey* this Court rejected an argument that the Board, in interpreting the meaning of a medical text, inappropriately rendered its own medical opinion.  In that case we held that "interpretation of a medical treatise's meaning and assessment of its probative value as evidence in support of the claim being adjudicated are within the purview of the Board as factfinder." *Harvey v. Shulkin*, 30 Vet.App. 10, 20 (2018).

As to assigning probative value to medical text evidence, the Board generally treats such evidence in alternate ways.  If submitted on its own, *unaccompanied* by a medical opinion that applies the medical text to the facts of a case, medical text evidence is generally separately weighed by the Board and assigned an appropriate level of probative value.  For example, in *Wise* the Court held that, as part of its evaluation of the evidence of record, the Board had an obligation to consider and discuss potentially favorable medical text evidence that was unaccompanied by a medical opinion. *Wise v. Shinse*ki, 26 Vet.App. 517, 531 (2014).  However, when medical text evidence

is submitted as an attachment or accompaniment to a medical opinion, or is quoted in a medical opinion, the Board might not individually assess its probative value. Instead, as in Mr. McCray's case, the Board often assesses the value of the medical opinion only, perhaps quoting from portions of the text that the expert relied on, but not assigning the medical text itself probative value. R. at 13-17; *see Polovick v. Shinseki*, 23 Vet.App. 48, 51-52 (2009).

## 2. Medical Opinion Evidence

Because it is settled law that Board members are not medical experts and may not substitute their medical judgment as to a medical question when medical expertise is required, *see Colvin v. Derwinski*, 1 Vet.App. 171, 175 (1991), many, if not most, claims for service connection require medical opinion evidence. Early caselaw established that the probative value and adequacy of medical opinion evidence is based on the medical expert's personal examination of the patient, knowledge and skill in analyzing the data, and the medical conclusion reached. *See Guerrieri v. Brown*, 4 Vet.App. 467, 470-71 (1993). More recently, in *Stefl*, the Court clarified that, to be adequate, a medical opinion must contain not only clear conclusions with supporting data, but also a reasoned medical explanation connecting the two. *Stefl v. Nicholson*, 21 Vet.App. 120, 123 (2007).

In *Daves,* the Court held that, where an expert medical opinion is unclear and susceptible of two meanings, and the Board did not address either possibility raised by the opinion, remand was required for the Board to provide clarification or remand for the expert to clarify. *Daves v. Nicholson*, 21 Vet.App. 46, 51-52 (2007). In *D'Aries,* the Court identified several factors to be considered in assessing the probative value of a medical opinion: the expert's familiarity with the pertinent medical history, whether there is any inconsistency in the expert's own statements, and whether the expert has provided a thorough and detailed opinion about an area within his or her expertise. *D'Aries v. Peake,* 22 Vet.App. 97, 108 (2008).

In *Nieves-Rodriguez*, the Court further refined its take on the Board deciding the persuasiveness of medical opinions, holding that "it is the factually accurate, fully articulated sound reasoning for the conclusion, not the mere fact that the claims file was reviewed, that contributes probative value to a medical opinion." *Nieves-Rodriguez v. Peake*, 22 Vet.App. 295, 304 (2008). The Court determined that medical examiners are essentially expert witnesses and that the probative value of a medical opinion may be reduced, or its adequacy become questionable, if the opinion is not based on sufficient facts or data, not the product of reliable

principles and methods, or not the result of principles and methods reliably applied to facts. *Id.* at 302.

### D. Qualifying or Contradictory Statements in Underlying Medical Text Evidence May Affect the Probative Value or Adequacy of a Medical Opinion

The Court has not addressed factors relevant to the Board's evaluation of probative value and adequacy in the case of a medical opinion that relies on a medical text that is, at least in part, entered into the record. Here, the June 2016 audiologic expert noted that the IOM concluded, in part, that "based on current knowledge of cochlear physiology there was no sufficient scientific basis for the existence of delayed-onset hearing loss." R. at 13 (Board decision, citing June 2016 Compensation Audiology addendum). However, the IOM report also indicated that "[t]here is not sufficient evidence from longitudinal studies in laboratory animals or humans to determine whether permanent noise-induced hearing loss can develop much later in one's lifetime, long after the cessation of that noise exposure" and that "definitive studies to address this issue have not been performed." Appellant's Br. at 12-13 (citing to R. at 151-52).

As noted, the Court has previously in various cases assembled a non-exhaustive list of factors that, depending on the case, may be relevant considerations in determining the adequacy and probative value of a medical opinion: whether there was personal examination of the patient; the expert's knowledge and skill in analyzing the data; whether the opinion contains clear conclusions with supporting data and a reasoned medical explanation connecting the two; whether the opinion is clear and susceptible of only one meaning; the expert's familiarity with pertinent medical history; whether there is any inconsistency in the expert's statements; whether the expert has provided a thorough and detailed opinion about an area within his or her expertise; whether the expert has provided factually accurate, fully articulated, and sound reasoning for his or her conclusion; whether the expert relied on sufficient facts or data; whether the opinion is the product of reliable principles and methods; and whether the opinion is the result of principles and methods reliably applied to facts. *See Nieves-Rodriguez*, 22 Vet.App. at 304; *D'Aries*, 22 Vet.App. at 108; *Stefl*, 21 Vet.App. at 123; *Daves*, 21 Vet.App. at 51-52; *Guerrieri,* 4 Vet.App. at 470-71.

The Court now includes on this non-exhaustive list another factor: whether the medical text evidence that the medical opinion relies on contains qualifying or contradictory aspects. If the Board finds that a medical text that serves as the basis for a medical opinion contains apparent qualifiers or contradictions, or if the veteran raises the issue or it is reasonably raised from review

of the evidence of record, the Board must address that issue and explain whether those aspects of the medical text diminish the probative value of the medical opinion evidence or render the opinion inadequate, and if not, why not. *See D'Aries*, 222 Vet.App. at 107 (the Board must explain its assessment of medical evidence in a manner adequate to enable a claimant to understand the precise basis for the Board's decision, as well as to facilitate review in the Court); *see also Nieves-Rodriguez*, 22 Vet.App. at 301; *Stefl*, 21 Vet.App. at 124.

This analysis is required because it is expected that qualifications or contradictions in medical evidence, including in underlying medical text evidence, may impact the probative value or adequacy of the medical opinion itself. *D'Aries,* 22 Vet.App. at 108 (probative value lessened when a medical opinion contains contradictions). Thus, as here, where the veteran explicitly raised the issue prior to the Board decision, the Board must respond and not ignore the veteran's argument.

If the Board requires assistance in understanding or interpreting the underlying medical text evidence, it may seek clarification from the medical expert who wrote the opinion or from another source. *See Savage v. Shinseki*, 24 Vet.App. 257, 273 (2011) (remanding for the Board to either seek clarification of audiologic examination reports or explain why such clarification is not necessary); *Daves,* 21 Vet.App. at 51-52. However, as we determined in *Harvey,* the Board is perfectly capable of interpreting medical text evidence on its own, *Harvey,* 30 Vet.App. at 20, and is also able to interpret medical opinion evidence. Since these undertakings are inherent in its adjudicatory fact-finding responsibilities, the Court does not foresee the necessity for extensive Board remands on this basis.

Accordingly, especially here, where the veteran's arguments concerning apparently qualifying or contradictory statements in the IOM report were of record when the Board made its decision, R. at 147-48, the Board was obligated to address the issue when assessing the probative value and adequacy of the June 2016 medical opinion that relied on the IOM report. Instead, the Board summarily determined, without mentioning the issue, that the June 2016 addendum opinion provided "scientific studies and theories to support the medical opinion, was "sound and supported by adequate rationale," "well-supported," and worthy of "controlling weight." R. at 13, 17.

The Secretary argues that the Court cannot interpret the IOM report because such action would be outside our scope of review, Secretary's Br. at 11, citing 38 U.S.C. § 7261(c). But the Court need not evaluate in the first instance whether there are qualifications or conflicts in the

IOM report, and, if so, whether any such features affect probative value and adequacy. That task is to be accomplished by the RO and the Board, but neither entity spoke to the issue, thus requiring remand. *See Tucker v. West*, 11 Vet.App. 369, 374 (1998).

Additionally, the Secretary argues that Mr. McCray fails to show that the overall premise of the IOM report is so flawed that it demonstrates clear error as to the Board's determination that the June 2016 medical opinion is adequate, Secretary's Br. at 10-12, and then proceeds to explain why the IOM's findings support the VA expert's opinion. *Id.* at 11. However, the Secretary's impermissible post-hoc rationale cannot make up for shortcomings in the Board's assessment of the medical opinion. *See Doty v. United States*, 53 F.3d 1244, 1251 (Fed. Cir. 1995) ("'Courts may not accept appellate counsel's post hoc rationalizations for agency action. It is well established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself.'" (quoting *Motor Vehicle Mfrs. Ass'n of the U.S., Inc., v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50, 103 S. Ct. 2856, 77 L. Ed. 2d 443 (1983))); *Evans v. Shinseki*, 25 Vet.App. 7, 16 (2011) (explaining that "it is the Board that is required to provide a complete statement of reasons or bases" for its decision and "the Secretary cannot make up for [the Board's] failure to do so" by providing his own reasons or bases on appeal). The veteran raised a potential qualifying or contradictory aspect of the underlying medical text that the Board did not address; therefore, the Court will remand the case for the Board to comply with its statutory duty to explain its conclusions as to the persuasiveness and adequacy of the VA medical opinion that relies on the IOM report.

To the extent that Mr. McCray claims that Dr. Trotter's opinions are inadequate because she failed to reference the apparently qualifying or contradictory statements in the IOM report, the Board, in accord with its obligation under 38 U.S.C. § 7261(c) and *Caluza,* must on remand analyze the probative value of her opinion in light of this argument. *See Caluza*, 7 Vet.App. at 506.

The Court reminds the Board, per *Quirin v. Shinseki,* 22 Vet.App. 390, 395 (2009), that when evaluating medical text evidence and medical opinion evidence as to an unsettled medical question, it must bear in mind the reasonable doubt doctrine. As the Court explained in *Wise*, in keeping with the benefit of the doubt standard of proof, a medical principle need not reach scientific consensus to adequately support a grant of VA benefits. *Wise v. Shinseki*, 26 Vet.App. 517, 532 (2014). Instead, by virtue of 38 U.S.C. § 5107(b)'s low standard of proof, which is applicable as to all issues material to a claim for veterans benefits, Congress has authorized VA to

resolve a medical question in a VA claimant's favor so long as evidence for and against that question is in "approximate balance." Imposing a higher standard of proof would be counter to the benefit of the doubt standard. *See id.*

In conclusion, the Court holds that, when the Board relies on a negative medical opinion, it must, consistent with its reasons or bases responsibility, address the veteran's arguments challenging the medical text supporting that opinion and assess the existence and impact of features of the underlying medical text evidence that may affect the probative value and adequacy of the medical opinion. Because the Board erred in failing to address apparently qualifying or contradictory statements in the medical text evidence here, the Court will set aside the June 2017 Board decision and remand the matter of service connection for left ear hearing loss. *See Tucker*, 11 Vet.App. at 374; *see also Jones,* 23 Vet.App. at 393-94.

### E. Right Ear Hearing Loss Claim

Relying on VA audiology reports and opinions, the Board determined that Mr. McCray does not have right ear hearing loss for VA purposes and that service connection should be denied. R. at 14-16. Mr. McCray argues that the Board improperly downgraded both Dr. Caudle's December 2012 audiogram result that showed right ear hearing loss for VA purposes and her January 2013 diagnosis of right ear hearing loss. Appellant's Br. at 15-17. The Court agrees that the Board, in concluding that Mr. McCray has no current diagnosis of right ear hearing loss for VA purposes, R. at 16, failed to take appropriate action and provide adequate reasons or bases for its determination. *See Gilbert*, 1 Vet.App. at 57.

Specifically, although the Board discounted Dr. Caudle's audiogram report as to the right ear, it did not identify any deficiencies as to that audiogram other than the fact that it was at odds with VA's July 2010 audiogram result. R. at 14. To the extent that the Board implicitly concluded that Dr. Caudle used a non-VA audiogram protocol, R. at 12-14, without having a foundation for that conclusion, the Board erred. The Secretary has a duty to assist claimants in developing their claims, including making "reasonable efforts to assist a claimant in obtaining evidence necessary to substantiate [a] claim." 38 U.S.C. § 5103A(a)(1). "[P]art of those 'reasonable efforts' includes seeking clarification of unclear 'evidence,' which necessarily includes medical examination reports," in accordance with 38 C.F.R. § 19.9(a). *Savage*, 24 Vet.App. at 264. Section 19.9(a) provides that, "[i]f further evidence, clarification of the evidence, correction of a procedural defect, or any other action is essential for a proper appellate decision, a [Board member] shall remand the

case to the agency of original jurisdiction, specifying the action to be undertaken." 38 C.F.R. § 19.9(a) (2018).

Here, the Board not only presumed that Dr. Caudle's audiogram was not performed to VA protocols without providing an explanation for that determination, it did not undertake the development outlined in *Savage* or explain why such development was not necessary. But as our caselaw makes clear, the Board was obliged to resolve uncertainty as to Dr. Caudle's 2012 audiogram by seeking clarification as to whether it conformed with VA audiogram protocols, prior to deciding that the veteran did not have right ear hearing loss for VA purposes, or explain why such development was not required. *See Savage*, 24 Vet.App. at 273 (in "instances in which missing information is relevant, factual, and objective–that is, not a matter of opinion–and where the missing evidence bears greatly on the probative value of the private examination report" remand was required for the Board to either seek clarification of private examination reports or explain why such clarification was not necessary).

Thus, the Court concludes that remand and readjudication of Mr. McCray's right ear hearing loss claim is warranted so that the Board may provide a written statement of reasons or bases for its findings and conclusions as to Dr. Caudle's 2012 right ear audiogram results and comply with *Savage* as necessary. *See* 38 U.S.C. § 7104(d)(1); *Tucker*, 11 Vet.App. at 374.

The Court will not address Mr. McCray's additional arguments at this time; he is free to present any additional arguments and evidence to the Board on remand in accordance with *Kutscherousky v. West*, 12 Vet.App. 369, 372-73 (1999) (per curiam order). *See Kay v. Principi*, 16 Vet.App. 529, 534 (2002). The Court reminds the Board that "[a] remand is meant to entail a critical examination of the justification for [the Board's] decision," *Fletcher v. Derwinski*, 1 Vet.App. 394, 397 (1991), and must be performed in an expeditious manner in accordance with 38 U.S.C. § 7112.

### III. CONCLUSION

Upon consideration of the foregoing, the Court will SET ASIDE the portion of the June 9, 2017, Board decision denying service connection for left and right ear hearing loss and REMAND those matters for additional development, if necessary, and readjudication consistent with this decision.